In the MATTER OF the GUARDIANSHIP OF CLIVE R.O.:

CYNTHIA H., Petitioner-Appellant,

v.

JOSHUA O. and Kristine O.,
Respondents-Respondents.

Court of Appeals

*No. 2008AP2456–AC. Submitted on briefs August 17, 2009.
—Decided November 4, 2009.*

2009 WI App 176

(Also reported in 777 N.W.2d 664.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Stephen W. Hayes* of *Grady, Hayes & Neary, LLC*, Waukesha.

On behalf of the respondents-respondents, the cause was submitted on the brief of *Marcia Bains Grebner* of *Law Office of Marcia Bains Grebner*, Eagle River, and *Linda S. Coyle* of *Law Office of Linda S. Coyle*, Waukesha.

Before Neubauer, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. This is an appeal from the denial of a permanent guardianship to Cynthia H., the grandmother of Clive R.O. Cynthia contends that the trial court applied "an incomplete and incorrect legal standard under [Wis. Stat.] chapter 54 ... and/or *Barstad v. Frazier*[, 118 Wis. 2d 549, 348 N.W.2d 479 (1984)]." Cynthia further contends that the trial court "misinterpreted current guardianship law in concluding that if the guardianship 'stays in place,' Kristine O. and Joshua O. will never really have a chance to be parents." We cannot agree with Cynthia's contentions. The record demonstrates that the trial court not only applied the correct legal standard and interpretation of the law, it

also commendably attempted to handle this case without further dividing the opposing parties, who are family. We affirm.

¶ 2. Clive was born on September 28, 2007, in Oregon to Kristine and Joshua. Kristine is the daughter of Cynthia, the petitioner-appellant. Clive was the result of a planned pregnancy. Some time during the pregnancy, Kristine developed symptoms of postpartum depression, which continued after Clive's birth. Kristine's postpartum depression was diagnosed both by her obstetrician and later by Dr. Wendy Davis, an expert on postpartum depression.

¶ 3. Joshua testified that despite Kristine's postpartum depression, she cared for Clive daily and was able to do "a lot." Kristine bathed Clive, changed diapers, fed him, changed clothing and changed linens. Joshua explained that, although Kristine's postpartum depression was not getting in the way of caring for their baby, it was getting in the way of Kristine feeling good about herself. In short, Joshua said his wife "was a wreck" during her postpartum depression.

¶ 4. Joshua testified that Kristine's obstetrician advised him and Kristine to have a family member help out so that Kristine could have some respite. Joshua stated that his understanding of this advice "didn't mean permanent time off." Rather, he explained that "[i]t meant if [we] had a family member in town [we could] have [someone in our family] come over for a couple hours a day so Kristine c[ould] have a break [and that person could] take care of Clive, take care of house duties . . . just so Kristine could sleep . . . [and] rest."

¶ 5. Subsequently, Joshua explained that because he and Kristine did not have relatives in town who could help and because they could not afford a nanny or babysitter, they asked Kristine's mother, Cynthia, to

618

come to Oregon to help care for Clive.[1] Cynthia told Joshua that she was unable to stay in Oregon due to her job. However, she did offer to take Clive back to her home in Wisconsin to care for him. Kristine and Joshua agreed to this arrangement and, in early November 2007, Cynthia took Clive to Wisconsin. At this time, there was no transfer of custody or guardianship proceeding; this was simply an agreement among family members.

¶ 6. Thereafter, because Kristine was not improving, she and Joshua contacted Dr. Davis, an expert on postpartum depression, and began counseling sessions on November 27, 2007. Dr. Davis testified that her diagnosis that Kristine was suffering from "major depression, . . . with postpartum onset" was based on a thorough assessment in which she determined that Kristine "was experiencing a lot of despair." Kristine, at that time, would go days without speaking and did not eat or sleep. Dr. Davis stated that, despite Kristine's postpartum depression, she did not hear of or observe "any threat of harm to the baby." Dr. Davis further testified that it was her assessment that Clive "was taken care of well" in the weeks that Kristine and Joshua cared for him after his birth. Dr. Davis characterized Kristine and Joshua's decision to allow Clive to go live with his grandmother Cynthia as "very healthy" and "courageous." Specifically, she testified:

> I thought [that allowing their baby to go live with his grandmother] was courageous . . . . I thought it was a very healthy decision actually, and I was glad that they had a grandmother to take care of the baby because the kinds of symptoms and feelings and physical, psycho-

---

[1] Cynthia had already been to Oregon right after Clive was born to help out for approximately ten days; but had gone back home thereafter.

logical, emotional that Kristine was having . . . were so overwhelming to her and she needed time to recover . . . and it's standard practice it's not unusual to have a grandmother or aunty or somebody either move in or—in some cases and in other cases I've helped have the baby stay with relatives for a little while.

Dr. Davis's professional opinion was that having the child removed from Kristine and Joshua was beneficial to Kristine in terms of her recovery and her therapy. She noted that it is very hard for a couple to problem solve and make clear decisions while in the middle of dealing with postpartum depression. She commended Kristine and Joshua for "working together and . . . communicat[ing] so well they were able to problem solve with [Cynthia] to say here's something we can do." She said she was "completely supportive" of their decision to allow Clive to be cared for by Cynthia "because it was well thought out" and voluntary.

¶ 7. Dr. Davis noted that it was not unusual that Kristine talked about giving Clive up for adoption because this "happens quite a lot with postpartum women that they're thinking that, talking about it in therapy." Dr. Davis stated that Kristine also said outside of therapy: "I don't think I can do this, I can't do this." Dr. Davis explained the clinical assessment and advice that she gave to Joshua and Kristine at the time:

[M]y strongest impression clinically, therapeutically, was that I said to Josh No. 1—[Kristine] needs to be heard. You have to stop telling her you want the baby back because she's not gonna be able to—there's no one to trust. She has nobody to trust. So you're gonna have to stop telling her, "This is wrong, I want [our baby] back," and start listening to her and we will go from there because my clinical, my therapeutic instinct was that if [Kristine] could get that safety around her emotionally, if she could just say to someone, "I don't

620

know how and I don't know if I can," that she might be able to recover and bring [their baby] home.

¶ 8. Kristine testified at trial. She related that had she known her stepfather, Steven, was living with Cynthia, she "would have never asked [Cynthia] to watch Clive while [she] recovered." Kristine and Steven had always had a tumultuous relationship. At the time she asked her mother to care for Clive, she believed that her mother was separated from Steven because that is what her mother led her to believe.[2] Kristine considered it a betrayal that her mother allowed Clive to be around Steven.

¶ 9. Cynthia testified that the "whole time I had Clive I was waiting for [Joshua and Kristine] to call me. They never called me . . . . They never did." In direct contrast, Joshua testified that he spoke with Cynthia "very frequently" during the time she was caring for Clive in Wisconsin. He said he heard from Cynthia during that time via text messages and e-mails, as well as having phone contact. Phone records confirmed nineteen phone contacts in November, one for nineteen minutes, one for thirteen minutes and some for approximately ten minutes. Joshua said that these contacts were "status updates both on Clive and Kristine." He said that "almost every phone call started off hey, Josh, how's it going, Clive's doing great, everything's great, I found a baby-sitter or whatever she was dealing with at the time, very health[y], very happy."

¶ 10. Both Joshua and Dr. Davis testified that Dr. Davis advised Kristine and Joshua to stop contact with Cynthia because the contact with Cynthia, in Dr.

---

[2] In her testimony, Cynthia confirmed that she had indeed led Kristine and Joshua to believe she was separated from Steven.

Davis's professional opinion, impeded Kristine's recovery, acting as a "trigger" that would set Kristine back. Dr. Davis testified that after her recommendation to the couple, she also talked to Cynthia. This was during the beginning of December and, in this conversation, Dr. Davis said that she explained to Cynthia that Kristine was working on her recovery and needed space. She told Cynthia that Kristine and Joshua "needed to create a boundary . . . to not have contact with [Cynthia]." Dr. Davis said that Cynthia "seemed" very understanding of this.

¶ 11. Cynthia acknowledged this conversation with Dr. Davis. Cynthia testified that in December, shortly after her conversation with Dr. Davis, Joshua called her and said that he and Kristine had decided to give Clive up for adoption. Cynthia said she responded by telling Joshua that she would keep Clive, and Joshua told Cynthia that he would have to talk to Kristine about that plan. Cynthia stated that around this same time, she received an e-mail from Kristine which said, "[Y]ou will adopt him, you won't contact me again, you'll pay all the legal fees, you'll pay all the medical fees."

¶ 12. Joshua recalled the conversation differently and testified that on December 15, the day after Dr. Davis told Cynthia not to have contact or pressure Clive's parents, Cynthia gave him an ultimatum, demanding that either he and Kristine come and get Clive or allow Cynthia to adopt him. Joshua inferred that Cynthia "needed an answer . . . [r]ight then." He said Kristine heard the content of this phone conversation and "flipped out." He said Kristine "was livid that her mom was asking her to make this decision. There was really no decision to make . . . . All Kristine needed was time, and what Cindy was doing was pressuring her, get fixed, get fixed, get fixed, get better, get better, get

better." Joshua said that after this and on the advice of Dr. Davis, he and Kristine stopped most contact with Cynthia.

¶ 13. In her testimony, Dr. Davis explained what happens to women in postpartum depression:

> Much of what happens for women in severe postpartum depression is the great divide between what they're saying externally and what they're feeling internally, and much of the time we don't really know what's happening internally until they're recovered.

She testified that "women in the middle of a postpartum depression . . . think and write and feel all kinds of what looks outlandish, especially with our expectations about new motherhood . . . . [I]t's common, and they're horrified by it, as Kristine was." Dr. Davis described that Kristine's trigger to becoming angry and irritable was when she was pressured by Cynthia and anyone who would comment about the situation by judging and saying things such as: "are you taking medication, what are you doing, this is wrong, mother's don't act like this." Dr. Davis explained that Kristine "would be almost back, we'd be talking about . . . maybe she and Josh could [take Clive back and parent] and then [Kristine] would lash out" upon hearing the judgment and feeling the pressure from Cynthia and others.

¶ 14. Several e-mail correspondences between Kristine and Cynthia and at least one between Kristine and Attorney Kelly Neitzke are part of the record. In the e-mails between Cynthia and Kristine, Kristine often complained about money problems. In Kristine's e-mails, she describes how she is feeling and doing. She expresses that she is "frustrated," but also expresses "happiness." She expresses confusion about this "strange situation that I really don't know how to deal

with." In an e-mail sent from Kristine to Cynthia on December 15, 2007, the subject line was titled, "Adopting Clive." The rest of the e-mail related the following:

Hi,

Josh told me that you want to adopt Clive. So, if that is something you want to do the following things MUST happen:

-All hospital bills related to the birth must be paid for (not sure how much the outstanding balances are but well over 2k)

-You are to take care of setting up and paying for all legal issues

-Josh is to be contacted during the process for all communication . . . .

-After legal stuff is done do not contact us EVER again

Let me know if and when you would like to get this done.

Thanks.

¶ 15. On Janauary 10, 2008, Kristine sent Cynthia an e-mail with the subject line "Please respond." In it she wrote that she and Joshua have not heard from Cynthia's attorney and they are "wondering what is going on?" She stated, "I appreciate your help with us trying to figure out if we could keep Clive." In the same e-mail, she stated that her "life has essentially fallen apart since [she] had the baby." She expressed her need for "closure to this entire mess" and stated, "[E]ven if we WANTED Clive there is no way we could because we are so incredibly broke." She closed the e-mail with: "Anyways, I just need to know where you are at

with this whole ordeal. We found other families that will move fast and can pay for everything tomorrow. My stress level is at its maximum and I need to alleviate parts of it ASAP. Please let me know. Thanks."

¶ 16. On February 8, 2008, Attorney Neitzke sent Kristine an e-mail in which she related that she had "discussed the status of the termination of parental rights/adoption matter with your mother, and I would like to take this opportunity to touch base with you as well as to our proposed plan of attack." She then outlined the "proposed plan of attack." Kristine sent an e-mail response which related that she and Joshua "are currently considering a more suitable permanent home for Clive." Kristine also related that they were "considering alternative adoption choices." Kristine expressed concern regarding her mother's husband. She ended with expressing that she and Joshua "appreciate everything [Cynthia] has done for us in the short term, but we are not convinced she will provide the best long term home for Clive."

¶ 17. Joshua testified that he called Cynthia in February 2008 and that the "whole purpose of calling [Cynthia after not having had contact for a while] was to say hey . . . we are ready to have our child back, Kristine's feeling better, this is the news that you are waiting to hear, Cindy." He told Cynthia that he and Kristine planned to move to Wisconsin. Joshua stated that Cynthia responded by telling him she did not think moving to Wisconsin was a good idea. Joshua said she told him "I don't want to lose [Clive]." Joshua said this response "struck [him] out of left field." He said he then spoke very softly and slowly to Cynthia, telling her "Cindy, what are you gonna lose, we still want you to play Grandma, we're not gonna take him away from you." He said Cynthia responded, "Well, I'm very attached."

¶ 18. Joshua testified that throughout the first two weeks of February, he kept trying to talk to Cynthia about getting Clive back and "[s]he didn't have time to discuss any pragmatic issues about this . . . . [S]he had not related any elation to me that she was happy to hear this information." Joshua explained:

> So I was actively working to try to get a hold of her to say Cindy, your daughter is better, she wants our son back, we are ready to move on with our lives, we're ready to be the happy family that we planned, and we're ready to relieve you from being the full-time caregiver, what is the problem here. She did not want to hear that. She did not want to talk about it.

¶ 19. Cynthia's testimony regarding the conversations with Joshua differs from his. Cynthia testified that Joshua spoke to her only once about moving to Wisconsin and that he "never" mentioned that Kristine wanted to be with her and the baby. When pressed, Cynthia did recall Joshua saying, "[W]e're thinking that maybe we could all be close." Further, Cynthia stated that she did not tell Joshua it was not a good idea to move to Wisconsin; rather, she said she told him that if he and Kristine moved to Wisconsin they would have to support themselves. Phone records indicate that there were at least six phone contacts between their numbers during this time. Acknowledging the phone records, Cynthia agreed that there were more phone conversations between them, but stated that the content of these other phone calls were "mostly [Joshua and Kristine] asking [her] for money, [and saying] get this done quickly."

¶ 20. Joshua testified that in one of these communications, "Cindy had said that we needed to talk to her lawyer at this point." Joshua said it was his understand-

ing that the only reason there was a lawyer involved was so Cynthia could be granted authority to take Clive to a hospital or a doctor.

¶ 21. In February 2008, Joshua said he called Cynthia's lawyer, Attorney Neitzke, who returned his call on February 15. He said that Attorney Neitzke told him that Cynthia was "very attached to this baby" and she would like to adopt him. He said he expressed to Attorney Neitzke his confusion as to why they were even talking about Cynthia adopting Clive given that he had already told Cynthia that Kristine was getting better and they wanted their son back. He said that Attorney Neitzke tried to convince him that Kristine was not healthy and that she specifically asked him, "[W]ell, how could your wife possibly be better [if she has] not taken medications[?]" Joshua also said that Attorney Neitzke expressed to him that "under state law" it would be very difficult for him and Kristine to get Clive back because Clive had been in Wisconsin for three months and had only lived with them in Oregon for one month.

¶ 22. After hearing from Attorney Neitzke that it would be very difficult for him and Kristine to get Clive back, Joshua said he was "completely blown away and devastated . . . that there was this possibility that we wouldn't get Clive back and why wouldn't Cindy want to give him back and why was this attorney telling me that I didn't have a shot at getting him back[?]" He said during this phone conversation, he and Attorney Neitzke "quickly got into an argument because [h]e was still not understanding . . . ." He said Attorney Neitzke was suggesting that they needed to sign paperwork that she was ready to send over regarding terminating their parental rights. He said Kristine overheard bits and pieces of the conversation and that, because he "really didn't understand any of this at all," he was relating to Kristine the

627

information that Attorney Neitzke was telling him. At this point, "Kristine is the one who said isn't this some sort of temporary situation, and I said yeah, isn't this some sort of temporary thing because this was originally about medical stuff; right?" With this as their understanding, Joshua said he and Kristine agreed to sign the papers.

¶ 23. Attorney Neitzke related a somewhat different version of the conversation she had with Joshua on February 15. She stated that Joshua told her "their life was a mess . . . that his wife was suffering with postpartum, their business had failed, they were trying to get their business going again, and with all of that they could not make a decision regarding a TPR and adoption." Attorney Neitzke acknowledged that Joshua told her that he and Kristine "weren't prepared to make a long-term decision," and wanted to know if they could proceed with something less permanent such as a guardianship action. Attorney Neitzke also acknowledged that Joshua did "mention" to her that he and Kristine "were considering moving to Wisconsin to co-parent the child with Cindy." Attorney Neitzke characterized Joshua's position regarding the situation as one of "ambivalence," and again acknowledged that he told her he wanted the guardianship to proceed because they could not make a long-term decision to terminate parental rights and proceed with adoption. At the time Attorney Neitzke asked Kristine and Joshua to sign the termination of parental rights papers, she acknowledged that she knew a guardian ad litem had not yet been appointed for Clive and that Kristine and Joshua did not have their own attorney. Attorney Neitzke stated that she did inform the couple that a guardian ad litem would be appointed to ensure their decision was voluntary.

¶ 24. Thereafter, Attorney Neitzke sent a letter on or around February 19, 2008, to Joshua and Kristine. In the letter it stated that signing the guardianship papers "will allow Cindy to obtain medical coverage for Clive." Cynthia subsequently filed an action on March 5, 2008, to have herself appointed as guardian for Clive. On March 6, Cynthia was appointed temporary guardian with the consent of Joshua and Kristine.

¶ 25. Joshua testified that he and Kristine signed the guardianship papers in order to allow medical coverage to be obtained for Clive. He said they were "[n]ot by any means signing the papers because they were abandoning Clive."

¶ 26. Joshua testified that Kristine felt betrayed by her mother's negative reaction to them telling her they wanted to move to Wisconsin. Joshua said he and Kristine both felt Cynthia had turned her back on Kristine and this devastated Kristine. He said despite explaining to Cynthia that they were not asking for money, that they would figure out a way to move to Wisconsin on their own and that this was all great news because Kristine was better and they wanted Clive back, Cynthia "just didn't want us to come." Joshua said it was "at this point" that Kristine expressed her concern that the reason Cynthia did not want them in Wisconsin is because she must have gone back to her husband Steven. He said the idea of this "crushed" Kristine. He said Kristine felt that if this were the case, there was "no way that we could get Clive back," because "there was no way that she could fight Cindy and Steve."

¶ 27. Joshua explained that on March 18, 2008, when he and Kristine signed the termination of parental rights papers, they both "thought [they] had no options" but to terminate their parental rights. He said

they thought this meant they were signing adoption papers and that "it was over."

¶ 28. On May 16, 2008, two months after signing the TPR papers, Joshua and Kristine received a letter from Clive's appointed guardian ad litem, Attorney Clarice Perkins.[3] Joshua said that it was after receiving this letter and talking to Attorney Perkins that he and Kristine realized that their parental rights had not been terminated. In her report, Attorney Perkins confirmed that Joshua and Kristine told her that "they were led to believe that at this point they did not have any options left but to sign [the termination of parental rights papers]."

¶ 29. On May 30, 2008, approximately two to three weeks after learning they had not lost their parental rights, Joshua and Kristine retained an attorney in order to go forward with getting Clive back. A four-day bench trial was held on Cynthia's contested guardianship petition.

¶ 30. At trial, the court stated its understanding of the applicable law: Cynthia must show by clear, satisfactory, and convincing evidence that Joshua and Kristine are unfit to take care of Clive or that there are compelling circumstances based on the credible testimony that there are reasons that Cynthia's temporary guardianship should become permanent. The court was not persuaded that abandonment or any other compelling circumstance existed to take the custody of Clive

---

[3] Apparently, the guardian ad litem had sent Joshua and Kristine earlier letters to their Oregon address. Joshua testified that they did not receive any letters until the one they received on May 16, 2008, because their mail was very unreliable. He also testified that the reason he did receive all of Attorney Neitzke's paperwork was because her office always sent things via Federal Express.

away from Kristine and Joshua. It did not find them to be unfit or unable to care for Clive. It found that Kristine and Joshua made a "caring, intelligent decision . . . first to get the doctor's advice, second to follow the doctor's advice." It opined that the decision to follow the doctor's advice was not abandonment. It found that "the positive things that were done by Josh and Kristine together make sense." It stated that it "cannot make a finding of unfitness because someone has postpartum depression and [is] still coming out of it and then a litigation about guardianship begins and termination of parental rights begins and they go into a state of—of confusion, of feeling bad about that."

¶ 31. At the close of the trial, the court characterized the entire situation as one mired in miscommunication and concluded, "You can't basically persuade the Court that going for help and giving up Clive was a bad decision." In determining that Cynthia had not met her burden, the court dismissed Cynthia's permanent guardianship petition. Cynthia appeals.

¶ 32. On appeal, Cynthia argues that the trial court applied the wrong test when it determined not to establish her permanent guardianship. Cynthia asserts that the enactment of WIS. STAT. ch. 54 (2007–08),[4] effective December 1, 2006, changed the legal standard that is to be applied to petitions for guardianship of a minor. The enactment of ch. 54, she contends, created the legislative requirement that the "best interests"[5] of the child standard is the proper test.

---

[4] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

[5] We observe that "best interests" and "best interest" are both accepted terms used in the law and legal discourse.

¶ 33. This case presents a mixed question of law and fact. Custody determinations are based on first-hand observation and experience with the persons involved and, therefore, the discretionary decisions of the trial court are given great weight on appeal. *Barstad*, 118 Wis. 2d at 554. A custody award will be upset only if the appellate court is convinced that the findings of fact upon which the custody determination is based are clearly erroneous, WIS. STAT. § 805.17(2), or that the custody determination represents a clear abuse of discretion. *Barstad*, 118 Wis. 2d at 554. To find an abuse of discretion, an appellate court must find either that the circuit court has not exercised discretion or that it has exercised discretion on the basis of an error of law or irrelevant or impermissible factors. *Id.* We review statutory interpretations de novo. *Robin K. v. Lamanda M.*, 2006 WI 68, ¶ 13, 291 Wis. 2d 333, 718 N.W.2d 38. Additionally, whether or not the trial court applied the correct legal standard in exercising its discretion is reviewed de novo. *Id.*, ¶ 12.

¶ 34. Before we proceed, we express our disapproval of Cynthia's counsel's rendition of the facts, specifically counsel's gloss-over of the reason Kristine and Joshua asked Cynthia to care for their son, i.e., Kristine's uncontroverted diagnosis of postpartum depression. In counsel's statement of facts, not once is Kristine's postpartum illness or even the word "postpartum" mentioned. Rather, and only in passing, counsel states that Kristine had "emotional difficulty raising Clive" and later sought, but discontinued "treatment . . . for depression." This hardly gives the whole picture and substantially misses the mark in fulfilling counsel's duty to relate to this court the facts. To have left out the uncontroverted fact of Kristine's postpartum depres-

sion is to have, in essence, ignored the proverbial elephant in the room. Unlike counsel, neither the trial court nor this court discount Kristine's postpartum depression and its pivotal relevance to the events leading up to this case.

¶ 35. From the facts of record, we must agree with the trial court that this situation is one that has been rife with miscommunication and misunderstanding. What stood out to the trial court, and stands out to this court, is the unfortunate unraveling of family ties and confusion that stemmed from Kristine and Joshua's decision to follow the advice of Kristine's doctors to find a way to give her respite so she could recover from her postpartum depression.

¶ 36. We begin by emphasizing several uncontroverted facts. That Kristine had postpartum depression is uncontroverted. That Joshua and Kristine were given medical advice from two separate doctors—Kristine's obstetrician and Dr. Davis, an expert on postpartum depression—to give Kristine respite from caring for Clive so that she could recover is uncontroverted. That Kristine and Joshua first asked Cynthia to come to Oregon to care for Clive in their home is uncontroverted. That it was Cynthia's idea to take Clive back with her to Wisconsin—albeit for reasonable job-related reasons—to care for Clive is uncontroverted. That Kristine's behavior and her talk of giving up her baby for adoption reflects a common theme in women suffering from postpartum depression is uncontroverted.

¶ 37. The legal standard for guardianship of a minor is articulated in *Barstad*. *Barstad*, similar to this case, involved a custody dispute between the maternal grandmother and the mother of an eight-year-old child. *See Barstad*, 118 Wis. 2d at 551–52. There, our supreme

court noted that until then, neither the United States Supreme Court nor the Wisconsin Supreme Court had ever addressed the specific question posed by the case, i.e., what the constitution requires in a custody dispute between a parent and a nonparent third party. *Id.* at 562. In reaffirming that the relationship between a parent and child is a constitutionally protected right, *id.* at 556–67, it concluded that the "best interests of the child" is not the proper standard in custody disputes between a natural parent and a third party, even if the third party is a grandparent, *see id.* at 554–55. The supreme court aptly noted the very real "cross-currents of parent-grandparent relationships, where the whirlpools of love and attachment may pull powerfully in opposite directions," *id.* at 556. It explained why the " 'best interest' standard cannot be the test": "When a parent is young, the physical, financial and even emotional factors may often appear to favor the grandparents. One cannot expect young parents to compete on an equal level with their established older relatives." *Id.* The court pointed out that if the " 'best interest' " standard were the test, "we would be forced to conclude that only the more affluent in our society should raise children. To state the proposition is to demonstrate its absurdity." *Id.*

¶ 38. In examining what the standard should be, the supreme court noted that although transfer of legal custody of a child from a parent to a third party does not have the finality of termination of parental rights, change of custody may result in as complete a severance of child-parent ties as does termination. *Id.* at 555. It therefore concluded that "in the absence of compelling reasons the principles followed in cases involving termination of parental rights should be followed where a

634

request for a custody change from a parent to a third party is presented to a court." *Id.* at 556.

¶ 39. It then established the rule to be followed in custody disputes between parents and third parties:

> [A] parent is entitled to custody of his or her children unless the parent is either unfit or unable to care for the children or there are compelling reasons for awarding custody to a third party. Compelling reasons include abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child. If the court finds such compelling reasons, it may award custody to a third party if the best interests of the children would be promoted thereby.

*Id.* at 568–69.

¶ 40. In short, our supreme court in *Barstad* resolved two issues. It rejected the "best interests" standard in custody disputes between parents and third parties, and it established a bifurcated procedure similar to a termination of parental rights case in such disputes. As in a termination case, the court in a custody dispute must first find unfitness or inability to care for the child or "compelling reasons" similar to the grounds portion of a termination case. *See id.* at 556–57 and 567–68. After a finding of unfitness, inability or compelling reasons, the focus of the case then turns to whether or not the "best interests" of the child would be promoted by a transfer of custody from the parent to a third party. *See id.* at 568–69.

¶ 41. For decades prior to the December 1, 2006 enactment of Wis. Stat. ch. 54, guardianship law was found in Wis. Stat. ch. 880. Contrary to what Cynthia suggests, the law of *Barstad* has not been quashed by

the enactment of ch. 54. For her claim that the "best interests" standard is now the test for guardianship disputes between a parent and a third party, Cynthia relies specifically on two sections of ch. 54: WIS. STAT. § 54.10(1), which states, "A court may appoint a guardian of the person . . . for an individual if the court determines that the individual is a minor," and WIS. STAT. § 54.15(5), which states, in pertinent part, "If one or both of the parents of a minor . . . are suitable and willing, the court shall appoint one or both as guardian unless the court finds that the appointment is not in the proposed ward's best interest."

¶ 42. Under Cynthia's interpretation, the trial court must always engage in a "best interests" test even if a parent is found to be fit, able and no other compelling reason exists. To read the statute this way would force the very absurdity that our supreme court rejected in *Barstad*, i.e., it would oblige the trial court to measure such things as the relativity of the third party and the parent's affluence and parenting experience. *See Barstad*, 118 Wis. 2d at 556. More often than not, on these types of measures, a fit and able parent would lose custody of his or her child. Surely this is not what the legislature intended.

¶ 43. Likewise, examination of more recent case law elucidates why it would be an unreasonable interpretation of WIS. STAT. ch. 54 to hold that it mandates application of the "best interests" standard in every third-party-vs.-parent custody dispute. In 2006, we addressed the bifurcated nature of a custody dispute between a parent and third party in the particular context of a guardianship proceeding. *Nicholas C.L. v. Julie R.L.*, 2006 WI App 119, 293 Wis. 2d 819, 719 N.W.2d 508. There, we made plain that a standard that does not consider a parent's constitutional rights is

incomplete. *Id.*, ¶ 16. We explained: "Were we to conclude otherwise, parents would routinely have their parental rights stripped from them simply because a third party might be better situated to tend to the needs of the child." *Id.* We further emphasized that the due process clause of the Fourteenth Amendment prevents using a standard that does not consider a parent's constitutional rights because the due process clause protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000)).

¶ 44. What we held in *Nicholas C.L.* bears repeating: "Any standard that does not consider a parent's constitutional rights would be incomplete . . . . We will not employ any analysis that disregards the constitutionally protected right of the parent." *Nicholas C.L.*, 293 Wis. 2d 819, ¶ 16.

¶ 45. In her renewed abandonment claim, Cynthia likens the instant case to that in *Richard D. v. Rebecca G.*, 228 Wis. 2d 658, 599 N.W.2d 90 (Ct. App. 1999). She claims that *Richard D.* supports her position that Kristine and Joshua's constitutional protections disappeared because they abandoned Clive. We agree with Kristine and Joshua that *Richard D.* has no bearing on the case at bar because it is readily distinguishable. *Richard D.* involved a dispute between the birthmother of Caryn A.-G. and Caryn's foster parents. *Id.* at 660. In November 1996, the children's court entered an order finding that Caryn, who had been living with foster parents since April 1995, was a child in need of protection or services (CHIPS) under Wɪѕ. Sᴛᴀᴛ. § 48.13(10) (1995–96) (a child "[w]hose parent, guardian or legal custodian neglects, refuses or is

637

unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child"). *Richard D.*, 228 Wis. 2d at 660. In October 1998, just before the order, already extended once, was to expire, the State of Wisconsin filed a petition seeking to have it extended again. *Id.* The State's petition also asked that Caryn stay with the foster parents. *Id.* In December 1998, the trial court held an evidentiary hearing on the petition under WIS. STAT. § 48.64(4)(c) (1995–96). *Richard D.*, 228 Wis. 2d at 660. At the conclusion of the four-day hearing, the trial court extended the order and, contrary to the State's recommendation, decided that Caryn should be taken from the foster parents' home and placed with her birthmother. *Id.* The foster parents appealed. *Id.* at 661. We reversed and remanded for further proceedings. *Id.*

¶ 46. Here, unlike in *Richard D.*, there was no CHIPS finding regarding Clive; there was no governmental intervention. Instead, there was a decision made by Kristine and Joshua to ask their child's grandmother to care for him while Kristine, with her husband's help and in response to her doctors' recommendation, took respite in an attempt to recover from postpartum depression.

¶ 47. In contrast, the child in *Richard D.* was a four-year-old child with a mother who had "never borne any significant responsibility for the child [in the four years of the child's life] . . . and [had] not functioned as a member of the child's family unit." *Id.* at 665 (citing *Barstad* 118 Wis. 2d at 563). Moreover, *Richard D.* concerned a placement hearing under WIS. STAT. ch. 48, and not a guardianship petition. *See Richard D.*, 228 Wis. 2d at 660; *see also* WIS. STAT. § 48.357. The overriding consideration under ch. 48 is the "best interests"

of the child. *See* WIS. STAT. § 48.01(1). Since the child had been placed pursuant to a CHIPS order for two years under ch. 48, a different standard applied to the placement. In the instant case, Cynthia first received placement of Clive pursuant to a private agreement among family members and not under a governmental CHIPS order. Here, applying the ch. 48 "best interests" standard simply does not translate.

¶ 48. Having rejected Cynthia's urging that we rely on a CHIPS-related case as relevant precedent to this case, we finish our discussion of why we also reject her argument that WIS. STAT. ch. 54 mandates the "best interests" standard. We reject Cynthia's interpretation of ch. 54 quite simply because it would call into doubt the statute's constitutionality. And, "wherever doubt exists as to a legislative enactment's constitutionality, [interpretation of the statute] must be resolved in favor of constitutionality." *State v. Allen M.*, 214 Wis. 2d 302, 313, 571 N.W.2d 872 (Ct. App. 1997) (citing *Bachowski v. Salamone*, 139 Wis. 2d 397, 404, 407 N.W.2d 533 (1987)). Moreover, "[t]he standard set out in *Barstad* is a statement of 'constitutional principles.' This means that when it applies, this standard prevails over any different statutory language." *See Robin K.*, 291 Wis. 2d 333, ¶ 43, (Prosser, J., concurring) (citing *Barstad*, 118 Wis. 2d at 563). In short, we will not read ch. 54 to thwart the constitutional principles set out by our supreme court in *Barstad*.

¶ 49. We now briefly dispose of Cynthia's second argument that the trial court "misinterpreted current guardianship law in concluding that if the guardianship 'stays in place,' Kristine O. and Joshua O. will never really have a chance to be parents." First, the trial court

did not say what Cynthia claims. Cynthia relies on these two statements by the court for her claim:

> It doesn't make sense to treat postpartum this way if the person is in jeopardy of basically losing the opportunity to parent the child.
>
> . . . .
>
> We don't have a track record, but I think that reading the case law if the Court basically said the guardianship stays and it's permanent, okay, then the argument could be, a palpable argument at that, is that these two individuals, Joshua and Kristine, never had a chance, okay, and the only reason they didn't have a chance is because they did something that was recommended by a doctor in a postpartum situation.

Cynthia synthesizes the two statements to somehow fit her claim. We will not be misled. The trial court's statements speak for themselves. This court will not translate those statements into a manufactured statement that Kristine and Joshua "will never really have a chance to be parents." The trial court's comments do not belie error or any misinterpretation. Rather, they relate a proper application of guardianship law and, no doubt, recognition that, even though guardianship determinations do not have the finality of termination cases, they may still sever the parent-child ties in the same way. We specifically acknowledged this reality in *Barstad*: "[A] change of custody may result in as complete a severance of child-parent ties as does termination." *Barstad*, 118 Wis. 2d at 555.

¶ 50. Thus, the trial court did not misinterpret current guardianship law. Further, the record demonstrates that the trial court not only employed the proper test, it made its findings carefully and applied the law with an unerring exercise of discretion. Upon examina-

tion of the WIS. STAT. ch. 54 language, alongside the constitutional protections delineated by our supreme court in *Barstad* and followed in case law since, we reject Cynthia's argument that ch. 54 changed the legal standard that is to be applied to petitions for guardianship of a minor to the "best interests" of the child test.

*By the Court.*—Order affirmed.