In the MATTER OF THE GUARDIANSHIP OF ALEXIS C., a person under the age of 18:

STEPHEN R. and Ilya R., Petitioners-Respondents,

v.

ILANA C., Respondent-Appellant.

Court of Appeals

*No. 2010AP363. Submitted on briefs October 6, 2010.
—Decided December 8, 2010.*

2011 WI App 13

(Also reported in 794 N.W.2d 533.)

108

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Ilana S. Avital, Gai A. Lorenzen,* and *Nicholas J. Schwalbach* of *Legal Action of Wisconsin, Inc.,* Racine and *Jeffery R. Myer* of *Legal Action of Wisconsin, Inc.,* Milwaukee.

On behalf of the petitioners-respondents, the cause was submitted on the brief of *Brenda J. Dahl* and *Nicole L. Beddigs* of *Rizzo & Diersen, S.C.,* Kenosha.

A Guardian ad Litem brief was filed by *Patricia A. Zamba* of *Zamba Law Office, S.C.,* Salem, on behalf of the minor child.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. NEUBAUER, P.J. Ilana C. appeals from a circuit court order granting her mother and stepfather, Ilya R. and Stephen R., full guardianship of Ilana's daughter Alexis. Ilana challenges the order on three grounds. First, Ilana contends that Wisconsin lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), *see* Wis. Stat. ch. 822 (2007–08),[1] because Indiana was Alexis's "home state." Ilana next contends that the circuit court failed

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

111

to apply the correct legal standard for guardianship as set forth in *Barstad v. Frazier*, 118 Wis. 2d 549, 348 N.W.2d 479 (1984), and that Ilya and Stephen failed to meet their burden of proving that compelling reasons existed to grant a permanent guardianship. Finally, Ilana contends that the circuit court erred in denying her request to order visitation, instead deferring her request to Alexis's guardians, Ilya and Stephen. We uphold the circuit court's determination that Wisconsin has jurisdiction under the UCCJEA. We further conclude that the circuit court properly exercised its discretion in granting guardianship to Ilya and Stephen and deferring to them on the issue of visitation. We affirm the order.

## BACKGROUND

¶ 2. Stephen and Ilya filed for permanent guardianship of Alexis on May 27, 2009. The petition alleges both that a guardianship is in Alexis's best interests and that she is in need of a guardian because she resides with Stephen and Ilya, who support her. The circuit court scheduled a hearing and appointed a guardian ad litem. The notes from the July 14, 2009 hearing reflect that the circuit court granted Stephen and Ilya temporary guardianship of Alexis pending a contested guardianship hearing on August 20, 2009. On August 5, 2009, Ilana filed a motion to dismiss the guardianship petition on grounds that: (1) Alexis was placed with Ilya on May 27, 2009, and Ilana had never relinquished custody and care of her daughter and (2) Wisconsin is not Alexis's home state under the UCCJEA, and the court does not have any other grounds for jurisdiction. After briefing and argument by the parties, the circuit court determined that Wisconsin had jurisdiction and extended the temporary guardianship order. The matter proceeded to a contested guardianship hearing on October 29, 2009.

¶ 3. At the hearing, Ilana testified that prior to Alexis's birth she resided in Elkhart, Indiana, with her grandmother, Jessie Ellis. After Alexis was born on October 25, 2006, in Mishiwauka, Indiana, Ilana and Alexis moved in with Ilana's mother Ilya in Barrington, Illinois. In February 2007, Ilana and Alexis moved to Rockford, Illinois, to reside with a friend of Ilana's. Ilana testified that she had a job waitressing at the Big Foot Lounge and received some financial assistance from her roommate and the state.[2] In October 2007, Ilana took Alexis to Indiana to live with Ellis. Ilana testified that Ellis "was able to provide constant child care for [Alexis]" and that the move was Ilya's idea. Prior to the move, Ilana's roommate had been providing child care. Her roommate had two children of her own so Ilana believed Alexis would receive "more one-on-one time with [her] grandmother."

¶ 4. Ilana testified that after Alexis moved to Indiana, she saw Alexis "within the first couple of months. As soon as [she] could." Ilana testified that she visited Alexis "at least five" times during the eighteen-month period that Alexis resided with Ellis and called "every day or every couple days." Ilana testified that Alexis's daycare expenses in Indiana were shared by Ilya, Stephen and Ellis, with the exception of approximately $500 that Ilana gave to Ellis.[3] Alexis resided in Indiana with Ellis until March 2009 when Ellis suffered a heart ailment and was no longer able to care for her.

---

[2] Ilana testified that at some point between February 2007 and October 2007, she and Alexis lived at the Pump Handle motel for a couple of weeks. This was the only time that Ilana resided alone with Alexis.

[3] Ellis testified that Ilana provided at most $300 in financial support during the eighteen months that Alexis resided with Ellis.

¶ 5. Ilana testified that Alexis then went to Ilya and Stephen's house in Trevor, Wisconsin. Ilana acknowledged that she had been offered the opportunity to care for Alexis at that time. Ilana visited Alexis within the first two weeks that she lived with Ilya and Stephen, staying a couple of hours. She visited again in that first month, staying for a night or two, and assisting with Alexis's care. Ilana testified that during her visit there was a discussion regarding Alexis's long-term placement. Ilana testified that Ilya and Stephen had approached her about signing guardianship papers for medical and insurance purposes. When Ilana refused to sign them, Ilya threw a wine glass. Ilana recalled that the result of these discussions was that her family would help until she obtained her certified nursing assistant certificate and could work normal hours and care for Alexis. She understood that Alexis would come back to live with her at that time and she had asked for "some support with the situation." Ilana testified that in June and July 2009 Alexis had three overnight visits with her in Rockford.

¶ 6. At the time of the October 2009 hearing, Ilana testified that she had "achieved stability." She was living by herself in a three-bedroom apartment in Rockford, had obtained her certified nursing assistant (CNA) certificate, and was employed as a CNA.[4] Ilana acknowledged having been diagnosed as bipolar; however, she offered contradictory testimony as to whether

---

[4] Ilana's testimony was contradicted in part by Chet Gaines, a private investigator hired by Ilya. According to Gaines, Ilana had been working as an exotic dancer at Big Foot Lounge as late as October 3, 2009. Gaines also testified that, based on his observations, Ilana was not residing consistently at her new apartment and she was not residing alone, another female also resided at that address.

114

she had been diagnosed two months prior to the hearing or a year prior. Ilana also acknowledged that she was prescribed medication but did not continue to take it and did not return to the doctor for further treatment. She testified that she discontinued the medication because her insurance ran out and she did not feel she needed it. When questioned further, she clarified that she was not saying she "won't take it."

¶ 7. Ellis also testified at the hearing. According to Ellis, Ilana brought Alexis to Indiana two times for doctor visits in the first few months after Alexis was born. She testified that during the time that Alexis lived in Rockford with Ilana from February 2007 to October 2007, "[w]e were very concerned about whether [Alexis] was all right or not." When Ilana called Ellis about Alexis coming to stay with her, Ilana asked if Alexis could stay for "about a week and a half" because her roommate's children had the flu. Alexis stayed with Ellis for a year and a half. Ilana visited Alexis at Ellis's house on three occasions for four or five days during this period and called sporadically. Ellis testified that "sometimes [Ilana would] call twice a month. One time she didn't call for about four or five months." Ellis contacted Ilana to let her know things about Alexis, but found that Ilana's cell phone "was always full." She was unable to reach Ilana for three or four days when Alexis had an ear infection and Ellis did not have written permission to obtain medical care. It was evident from Ellis's testimony that Alexis would attend daycare even when Ilana was visiting.

¶ 8. With respect to Ilana's interaction with Alexis during her visits, Ellis testified: "I always cared for the baby . . . I mean, the baby came to me for whatever she needed." She further testified:

115

In the hospital I witnessed the fact that Ilana would not even hold the baby. Her mother and I fed the baby . . . . We cuddled that sweet, little kid. We played with her. We nurtured her. I have seen the nurse hand the baby to Ilana and Ilana just—I mean, it's just right there. She could have slipped off her lap or anything. I'm sorry. Excuse me. Did she take care of [Alexis] while she was at my house? No. Again I say no. She played with her, yes. She played with her like she was a doll, not like a mother would do.

In support of her testimony that Ilana had exercised "very poor judgment" in her care of Alexis, Ellis testified as to an incident where Alexis had gotten into a bath product that irritated her skin while Ilana was giving her a bath. Ellis also testified that during her visits, "Ilana seemed more concerned with her telephone and . . . she would go out to her car, turn on her stereo and smoke." Ellis testified that if there was a problem with Alexis, "[Ilana] would look me in the face and tell me I can't deal with this, take her." Ellis also testified about behavioral issues Alexis exhibited both in her home and at daycare, specifically laying on and choking Ellis's cats and laying on children at daycare. Ellis denied ever having seen Ilana abuse Alexis.

¶ 9. Ilya testified that she was in the room when Alexis was born. At that time she had concerns about Ilana's care of Alexis: "[Ilana] didn't want to hold her, she wouldn't feed her, she didn't want to change her. The nurses expressed their concern that she was not bonding or interacting with the baby." According to Ilya, the hospital did not want to release the baby to Ilana unless she agreed to go with Ilya and Ellis. As a result, Ilana and Alexis moved in with Ilya. Ilana's care of Alexis did not improve. At some point, presumably January and February of 2007, Ilana and Alexis resided

116

with a man Ilana had been seeing, and again, Ilya felt that Ilana's care of Alexis did not improve. Ilana moved with Alexis to Rockford in mid-February 2007 and did not contact or inform Ilya of their whereabouts until August 2007 when she asked Ilya to come get Alexis because she "needed a break." Ilya picked up Alexis and continued to care for her every weekend from that time until Alexis moved to Indiana. During Alexis's time in Indiana, Ilya spoke with Alexis and Ellis at least once a day and visited once a month. After Ellis's heart ailment, Ilya brought Alexis to Wisconsin to live with her and Stephen in March 2009. Ilya testified that following three visits with Ilana in Rockford, Alexis exhibited strange behavior, such as asking for a pill for "the shakes," trying to "French kiss" when kissed good night, and singing a song with an expletive in it.

¶ 10. Ilya further testified that during Ilana's visits with Alexis at their house, she observed Ilana providing "some" care of Alexis, playing with her and putting on her pajamas. However, on one occasion, Ilana gave Alexis a bath over a two-hour period. Ilya became concerned because the bath was taking so long. When she checked on Ilana and Alexis, the water in the bathtub was "all the way to the top" and Alexis slipped under the water. Ilana just sat "staring into space," not "really do[ing] anything else." On another occasion, Ilya observed Alexis crying out "Mommy, mommy" while standing in the middle of the street or cul-de-sac in front of their home. Ilana was talking on the phone and smoking a cigarette and did not direct her attention to Alexis even though Alexis's cries were loud enough for Ilya to hear in the house.

¶ 11. Finally, Ilya testified that their lack of guardianship had made it difficult to obtain health care for Alexis. She and Stephen had tried to explain to Ilana

that in order to have a pediatrician for Alexis and provide insurance they needed legal guardianship while Alexis was in their care. Ilya testified that she had explained to Ilana that they would be "up a creek" if Alexis were to have an accident or illness because Ilana is almost impossible to reach by cell phone and does not return calls. Ilya testified that Ilana refused to sign the guardianship document. Ilya acknowledged Ilana's plans to obtain a CNA certificate but testified that Ilana had been telling them that for almost two years. Ilya testified that when Ilana visited Alexis at their home, Alexis expressed concern and asked for reassurance from both Stephen and Ilya that she would not have to leave with Ilana. Ilana's financial support of Alexis was limited while Alexis lived with Stephen and Ilya, and Ilana's contact with Alexis was sporadic. Stephen expressed concerns similar to Ilya's in his testimony, including his concern that Ilana had never bonded with Alexis. Stephen testified that Ilana expressed no interest in talking about or addressing Alexis's unusual behaviors and makes no inquiries regarding Alexis's health and well-being.

¶ 12. Finally, Stephen and Ilya offered the testimony of Dr. Kristin Keeler, a clinical psychologist with ten years' experience. Stephen and Ilya had consulted with Keeler regarding Alexis's behaviors, including cruelty to animals, intense temper tantrums, her need for constant supervision to prevent destruction of property, and toileting accidents related to anger, defiance and intense emotions. Keeler had also met Alexis. Based on the information provided by Stephen and Ilya as to Alexis's history and symptoms, Keeler testified to a "reasonable degree of psychological certainty" that Alexis would fall under the category of Reactive Attachment Disorder (RAD). Keeler noted Alexis's history of

having several primary caregivers during her first three years of life and testified that her recommendation for a child with RAD is to provide a stable and consistent environment so that the child can create stable attachments. Keeler also addressed bipolar disorder as requiring the care of a doctor and typically treatment with prescription medication and/or therapy.

¶ 13. The circuit court issued its decision on November 11, 2009. The court noted that the guardian ad litem supported Ilya and Stephen's request for permanent guardianship. The court recognized that there must be clear and convincing evidence of extraordinary circumstances affecting the health and safety of the minor in order to grant guardianship over a parent's objection. The court indicated its thorough review of the testimony and its concern that Ilana's conflicting testimony as to her employment, living situation and bipolar disorder resulted in a "credibility issue." In contrast, the court found Ellis, Keeler, Ilya and Stephen credible. The court found that "it started pretty early in this child's life that this natural mother couldn't care for this child and it's continued through the years." After citing several examples of unusual behavior on the part of both Ilana and Alexis, the court made the following ruling: "This child, to prevent any harm in the future or neglect, needs . . . a guardianship. The evidence is there. The behavior is there. And the mother has a problem with the truth." After the court's grant of guardianship, Ilana's counsel asked the court to address the issue of Ilana's visitation or placement schedule with Alexis. The court deferred to the guardians and declined to "get involved in the issue of what a guardian does unless they do something that is unfit."

¶ 14. The court entered a written order for guardianship on November 11, 2009. Ilana appeals.

## DISCUSSION

*Jurisdiction under the UCCJEA, Wis. Stat. ch. 822*

¶ 15. *Standard of Review and Statutory Framework.* It is undisputed that this guardianship proceeding, commenced May 27, 2009, presents an initial custody determination as to Alexis. The UCCJEA governs interstate child custody disputes and is adopted in Wis. Stat. ch. 822. Wisconsin Stat. § 822.21, which governs initial custody jurisdiction, is the exclusive jurisdictional basis for making a child custody determination by a court of this state, and the physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination. Sec. 822.21(2)-(3). The determination of jurisdiction under the UCCJEA presents a question of law that we review independently of the circuit court. *N.J.W. v. State*, 168 Wis. 2d 646, 652, 485 N.W.2d 70 (Ct. App. 1992). Further, when interpreting statutes, we begin with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. "Statutory language is given its common, ordinary, and accepted meaning." *Id.* We interpret statutory language in the context in which it is used and in relation to the language of surrounding or closely related statutes. *Id.*, ¶ 46.

¶ 16. Ilana contends that the circuit court erred in its determination that Wisconsin had jurisdiction under the UCCJEA to conduct the guardianship proceedings. Pursuant to Wis. Stat. § 822.21(1)(a), a Wisconsin court has jurisdiction to make an initial determination if the state is the "home state" of the child on the date of the commencement of the proceeding or the

120

state was the home state of the child within the six months prior to the commencement of the proceeding and the child is absent from the state but a parent or person acting as a parent continues to reside in the state. It is undisputed that Alexis was only in Wisconsin for approximately three months at the time the petition was filed. *See* WIS. STAT. § 822.02(7) ("Home state" means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding.)

¶ 17. However, under WIS. STAT. § 822.21(1)(b), a state may exercise initial jurisdiction if, among other considerations, a court of another state does not have jurisdiction under the criteria of § 822.21(1)(a).[5] Ilana contends that Indiana was Alexis's "home state" and,

---

[5] WISCONSIN STAT. § 822.21(1) provides in its entirety:

**Initial child custody jurisdiction. (1)** Except as provided in s. 822.24, a court of this state has jurisdiction to make an initial determination only if any of the following applies:

(a) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

(b) A court of another state does not have jurisdiction under par. (a), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under s. 822.27 or 822.28, and all of the following apply:

1. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.

2. Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.

therefore, had jurisdiction over matters pertaining to Alexis at the time of the guardianship dispute.

■

¶ 18. At the crux of Ilana's contention that Indiana is Alexis's "home state" is the definition of a "person acting as a parent" under WIS. STAT. § 822.02(13). A "person acting as a parent" means a person who: (1) has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding and (2) has been awarded legal custody by a court or claims a right to legal custody under the law of this state. *Id.* It is undisputed that Ellis had physical custody of Alexis for a period of six consecutive months within one year of the commencement of these proceedings. Ilana contends that because Ellis also had a claim to a right of legal custody, Ellis meets the definition of a "person acting as a parent," and thus Indiana is Alexis's home state. We reject Ilana's argument.

¶ 19. *Analysis.* It is undisputed that Ellis has never been awarded legal custody and Ellis does not claim a right to legal custody. Ellis no longer cares for Alexis in Indiana and there are no plans for Alexis to

(c) All courts having jurisdiction under par. (a) or (b) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under s. 822.27 or 822.28.

(d) No court of any other state would have jurisdiction under the criteria specified in par. (a), (b), or (c).

(2) Subsection (1) is the exclusive jurisdictional basis for making a child custody determination by a court of this state.

(3) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination.

return to Ellis's care in Indiana. Further Ellis testified at the Wisconsin hearing in support of Ilya and Stephen's request to obtain permanent guardianship of Alexis, who resided at Ilya and Stephen's home in Wisconsin at the time of the hearing.

¶ 20. Ilana nevertheless contends that Indiana is Alexis's home state and that the circuit court's decision to the contrary "ignores that [Ellis] could be a 'person acting as a parent' if she 'claims a right to legal custody.' " Ilana contends that the phrase "claims a right to legal custody" is "simply de facto decision-making power," and Ellis's past exercise of that decision-making power is sufficient. We disagree.

¶ 21. A claim must be affirmatively asserted by the caretaker in the context of a custody proceeding in order for it to drive a jurisdictional determination. The statute does not provide for any other interpretation. Moreover, even if it were subject to more than one construction, it would be absurd to interpret WIS. STAT. § 822.02(13) otherwise. *See State ex rel. Kalal*, 271 Wis. 2d 633, ¶ 46 (statutory language is interpreted reasonably to avoid absurd or unreasonable results). The facts as presented in this case could not illustrate this more clearly. If we were to accept Ilana's contention that Indiana is Alexis's "home state" by virtue of Ellis's care for her, then jurisdiction would lie in a state where the child no longer resides (and there are no plans for her to return there to reside), where no proceedings have been filed and, most significantly, where not one person has asserted a claim for legal custody of her.

¶ 22. One of the purposes of the UCCJEA is to "[p]romote cooperation with the courts of other states to the end that a custody decree is rendered in the state that can best decide the case in the interest of the

123

child." Wɪs. Sᴛᴀᴛ. § 822.01(2)(b). The "home state" analysis is an attempt to ensure the availability of valid information not only about the child but also about the adults and the environment that the parent or the potential guardian will provide for the child. *See In re B.R.F.*, 669 S.W.2d 240, 246 (Mo. Ct. App. 1984). Here, there is little purpose in considering Indiana as the home state because Ellis is not seeking guardianship. As the circuit court noted, Wisconsin has relevant evidence regarding Alexis's proposed future care, protection and personal relationships.

¶ 23. Moreover, "legal custody" implicates the right and responsibility to make major decisions concerning a child, including authorization for nonemergency medical care and choice of school and religion.[6] *See* Iɴᴅ. Cᴏᴅᴇ § 31–9–2–67 (West 2010) ("legal custody" encompasses the "authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training"); *see also* Wɪs. Sᴛᴀᴛ. § 767.001(2)-(2m).

¶ 24. Ilana cites to three extrajurisdictional cases in which the day-to-day decision making of noncustodial caretakers was deemed to satisfy the requirement of claiming a right to legal custody.[7] However, none of these cases reach the issue presented here, namely, whether a person who could meet the definition of "a person acting as a parent" must actually claim or assert that right in the context of a custody dispute. In two of the cases, the person acting as a parent continued to

---

[6] We therefore decline Ilana's invitation to apply the definition for "de facto custodian" under Indiana law.

[7] Ilana cites to *Hangsleben v. Oliver*, 502 N.W.2d 838 (N.D. 1993), *Ruffier v. Ruffier*, 190 S.W.3d 884 (Tex. Ct. App. 2006), *In re B.R.F* ., 669 S.W.2d 240 (Mo. Ct. App. 1984).

provide the child's permanent residence and primary care at the time of the custody proceedings or was a party to those proceedings. *See Ruffier v. Ruffier,* 190 S.W.3d 884, 890 (Tex. Ct. App. 2006) (the Texas court lacked jurisdiction when the child left his grandmother's care in Belarus to travel to Texas for visitation); *In re B.R.F.,* 669 S.W.2d at 246 (grandmother who had been "acting as a parent" asserted claim in the context of custody proceeding). Moreover, there is no suggestion in any of these cases that the person deemed to be "acting as a parent" did not have authority and responsibility to make major decisions concerning the child's upbringing.

¶ 25. Here, there is no evidence in the record that Ellis believed her right to make major decisions concerning Alexis superseded Ilana's right to do so. Indeed, Ellis testified that when Alexis needed nonemergency medical care, she attempted (albeit unsuccessfully) to contact Ilana for permission. Because she was not Alexis's legal guardian, Ellis was unable to obtain medical care through ordinary channels. Ellis had to "plead" with her primary care physician of thirty years to treat Alexis's ear infection when Ilana could not be reached for consent. Ellis's testimony clearly demonstrates that any past decisions she made about Alexis's day care and medical care were a function of necessity and not an assertion of a claim to legal custody.

¶ 26. In arriving at its decision, the circuit court noted:

[T]he section that is required by the Court to look at is [Wis. Stat. §] 822.21 . . . . And the first thing it talks about is . . . residency by the child. And it's clear from the record that the mother is living in Illinois, the child was living in Indiana, and the child was living with the

125

great grandmother . . . [who] would not be considered a person acting as a parent because she did not . . . have legal custody by any court.[8]

So the court can look then to subsection (b), court of another state does not have jurisdiction. Again, a child is in Indiana with the great grandmother who does not have legal custody. The mother lives in Illinois. The grandparents live in Wisconsin. The child is in Wisconsin when the petition is filed and the petition was filed May 27, 2009. So basically . . . there was no state that had jurisdiction.

Wisconsin also has evidence available regarding the child's care, protection, training, and personal relationships because the petitioners are in Wisconsin and the child is in Wisconsin . . . .

[N]othing had been filed in other states regarding guardianship. So it's a case where nobody had jurisdiction. (Footnote added.)

Given that Ellis did not have legal custody and had not asserted a claim for legal custody when these proceedings commenced, we conclude that the circuit court properly determined that Indiana was not Alexis's "home state" and that Wisconsin had initial jurisdiction under § 822.21(1).[9]

---

[8] We recognize that WIS. STAT. § 822.02(13) also defines a "person acting as a parent" as a person who claims a right to legal custody. While the circuit court did not expressly address this definition, as discussed herein, we have concluded that the record does not support its application to Ellis.

[9] The circuit court did not specify whether it exercised jurisdiction under WIS. STAT. § 822.21(1)(b) or (d). Regardless, Ilana's challenge is limited to her assertion that Indiana is Alexis's "home state."

126

*The Grant of Guardianship to Ilya and Stephen*

¶ 27. Ilana next contends that the circuit court applied an incorrect legal standard in evaluating the custody dispute between a parent and a third party by focusing on the prospect of future harm and neglect. Our review of the circuit court's custody determination involves a mixed question of law and fact. *Cynthia H. v. Joshua O.*, 2009 WI App 176, ¶ 33, 322 Wis. 2d 615, 777 N.W.2d 664.

> Custody determinations are based on first-hand observation and experience with the persons involved and, therefore, the discretionary decisions of the trial court are given great weight on appeal. A custody award will be upset only if the appellate court is convinced that the findings of fact upon which the custody determination is based are clearly erroneous, or that the custody determination represents [an erroneous exercise] of discretion. To find an [erroneous exercise] of discretion, an appellate court must find either that the circuit court has not exercised discretion or that it has exercised discretion on the basis of an error of law or irrelevant or impermissible factors.

*Id.* (citations omitted). We review de novo whether the circuit court applied the correct legal standard in exercising its discretion. *Id.*

¶ 28. Ilana points to the proper standard as that set forth in *Barstad*. There, the court held that "unless the court finds that the parent is unfit or unable to care for the child or that there are compelling reasons for denying custody to the parent, the court must grant custody to the child's parent." *Barstad*, 118 Wis. 2d at 551. In *Cynthia H.*, this court recently explained that *Barstad* established a bifurcated inquiry when address-

ing custody disputes between parents and third parties: (1) the court must find unfitness or inability to care for the child or "compelling reasons" to deny the parent custody and (2) the court must then determine whether it is in the "best interests" of the child to transfer custody from the parent to the third party. *Cynthia H.*, 322 Wis. 2d 615, ¶ 40. "Compelling reasons" under *Barstad* include "abandonment, persistent neglect of parental responsibilities, extended disruption of parental custody, or other similar extraordinary circumstances that would drastically affect the welfare of the child." *Barstad*, 118 Wis. 2d at 568.

¶ 29. Here, the circuit court issued a lengthy decision in which it addressed the standard of law, including burden of proof, and set forth detailed findings of fact. Ilana is correct that the circuit court cited to the supreme court's decision in *Robin K. v. Lamanda M.*, 2006 WI 68, 291 Wis. 2d 333, 718 N.W.2d 38, as providing the appropriate standard of review. It is undisputed that the language from the guardianship statute relied on in *Robin K.* had been repealed, *see* 2005 Wis. Act. 387, § 307, and thus, the "extraordinary circumstances" standard is no longer controlling. However, the *Robin K.* court expressly recognized *Barstad* when setting forth the now-repealed statutory standard, stating: "[T]here may be similarities between the statutory requirement that a court find 'extraordinary circumstances requiring medical aid or the prevention of harm to his or her person,' Wis. Stat. § 880.03 [(2003–04)], and the *Barstad* requirement that a court find 'compelling reasons . . . .' " *Robin K.*, 291 Wis. 2d 333, ¶ 3 n.3. Based on the circuit court's findings of fact and analysis, we conclude that despite its citation to *Robin K.*, the circuit court's decision nevertheless identifies the compelling reasons underlying its decision to transfer custody.

¶ 30. At the outset, the circuit court found that Ilana had failed to testify truthfully regarding her employment, her living arrangements and the status of her bipolar disorder. After identifying specific instances of Ilana's untruthfulness, the court stated: "I don't know where she works . . . . I don't know who she lives with. I don't know what she's doing for her bipolar disorder, which would greatly affect her ability to care for . . . the health and safety of this child." The court cited testimony from Ellis that Alexis "cannot be cared for by the natural mother. [Ellis] said [Ilana] doesn't have the ability." Ellis had been unable to reach Ilana when Alexis had needed medical attention thus compromising Alexis's safety. The court revisited the history of Ilana's care of Alexis, or lack thereof, beginning with her birth: "[I]t started pretty early in this child's life that this natural mother couldn't care for this child and it's continued through the years." The court noted that Ilana's behavior has been described as "bizarre, hostile, rude," and that there had been an incident when Ilya had observed Ilana talking on the phone and smoking while Alexis was in the street.

¶ 31. Finally, the court focused on Alexis's "unusual behavior" as testified to by Ilya, Ellis and a psychologist. The court noted specific instances of odd behavior exhibited by Alexis after visits with Ilana, including asking for a pill for the shakes, urinating in public and trying to French kiss. It observed:

> [Alexis] has an issue with injuring animals. She wants to kill a dog or a cat. A three-year-old. Children don't normally say things like that unless there's been some sort of abuse or neglect. She lays on other kids in the daycare center . . . . That's unusual behavior. She's defiant. She's got behavioral problems that are not just normal for a three- year-old, and that issue was further

129

testified to by Dr. Keeler, who is a . . . clinical psychologist . . . ten years in practice. What does she tell the Court? There's major tantrum issues. There's anger issues. Child needs constant supervision. She's cruel to animals. She's got a Reactive Attachment Disorder. She needs a stable and consistent environment for her needs . . . .

And I think the most telling testimony of [Stephen] was that the natural mother needs to bond with the baby [because] it's never happened.

So clear and convincing evidence, burden of proof, I've got a doctor I find credible who's been qualified, Dr. Keeler, indicates all the unusual and extraordinary behavior this child has, needs total attention, total care. I find her testimony credible. I find [Stephen] and [Ilya's] testimony credible.

This child, to prevent any harm in the future or neglect, needs . . . a guardianship. The evidence is there. The behavior is there. And the mother has a problem with the truth . . . . And if the mother has a medical issue or a mental illness issue, it has to be treated. She doesn't have to lie about it.

¶ 32. Ilana seizes on the court's reference to Alexis's need for protection from future harm or neglect as demonstration that the circuit court failed to apply the proper standard, namely whether Ilana is unfit or unable to care for Alexis or whether there were other compelling reasons. Ilana contends that "[e]very child needs protection from future harm and neglect," and if this were the standard for guardianship, every child would need one. Ilana oversimplifies the court's statement. It is precisely Ilana's current ability to provide Alexis with adequate care that implicates her ability to protect Alexis from future harm and neglect.

¶ 33. In arriving at its decision, the court addressed Ilana's current situation, as well as her past

interactions with Alexis. The court's findings and the testimony presented at the guardianship hearing support a determination that Ilana has persistently neglected her parental responsibilities. Ilya testified that Ilana failed to provide adequate care for Alexis during the first four months of Alexis's life when they lived with Ilya. Ilana then lived with Alexis for the following eight months, with Ilya and Stephen providing weekend care for two of those months. When Alexis was approximately one year old, she went to live with Ellis in Indiana for eighteen months. During this time, Ilana visited on three occasions during which she took limited, if any, parental care of Alexis, called only sporadically—one time not calling for a four- or five-month period, provided at most $300 in financial support, and was difficult to reach by cell phone. Ellis turned Alexis over to Stephen and Ilya in March 2009, at which time Ilana declined the opportunity to have Alexis returned to her care. From March 2009 until the guardianship proceeding was commenced in late May 2009, Ilana visited only twice—once for a couple of hours and once for an overnight or two. While Alexis visited Ilana three times in Rockford, Ilya and Stephen testified that Alexis exhibited unusual behaviors when she returned to their care. Finally, Ilana faults the circuit court for speculating as to the status of her bipolar disorder and how it might affect her ability to care for Alexis. However, Ilana's contradictory testimony left the court with little choice but to speculate, and it is clear from the circuit court's decision that this was but one consideration of many.[10]

---

[10] We acknowledge Ilana's contention that the court's award of guardianship was, in part, premised on the court's finding that she lacked credibility. We reject Ilana's contention. The

¶ 34. Ilana contends that her decision to permit her grandmother and mother to care for Alexis, and as a result spend a significant time away from her child, does not rise to the level of a compelling circumstance. She cites to certain cases in which the courts have denied guardianship to a third party despite the fact that the parent was not the primary caregiver for a period of the child's life: *Robin K.*, 291 Wis. 2d 333, ¶¶ 1–5 (three year old who spent two and one-half years with great aunt not in need of guardianship); *Nicholas C.L. v. Julie R.L.*, 2006 WI App 119, ¶¶ 2, 5, 6, 30, 293 Wis. 2d 819, 719 N.W.2d 508 (court declined to grant guardianship to paternal grandparents over mother's objection despite the fact that the child and his father had lived with the paternal grandparents for a two-year period); *Barstad*, 118 Wis. 2d at 569 & n.10 (third party denied guardianship although mother and child lived apart for approximately two years); *Cynthia H.*, 322 Wis. 2d 615, ¶¶ 1, 30 (placing child in grandmother's care while mother recovers from postpartum depression not grounds for guardianship). However, each of these cases differs factually from this one.

¶ 35. In *Robin K.*, 291 Wis. 2d 333, ¶ 19, the supreme court cited the circuit court's findings of fact that there were no specific signs of neglect and that the Wisconsin Department of Human Services had decided against removing the mother's other children from the home, thus tacitly approving the appropriateness of placement in the mother's home. The supreme court

record is clear that the circuit court's references to her untruthfulness were made in the context of the difficulties it presented in ascertaining the status of her living situation, employment, or mental health—all relevant inquiries in determining Alexis's placement.

upheld the circuit court's determination that no need for a guardian had been shown. *Id.*, ¶ 20. In *Nicholas C.L.*, 293 Wis. 2d 819, ¶ 2, the child in question, a teenage boy, had been placed with his father as a result of a divorce judgment. The teenage boy and his father had resided with the boy's paternal grandparents for twenty-one months when his mother petitioned to revise placement. *Id.*, ¶¶ 1, 2. Shortly thereafter, the boy's father died in an accident and the paternal grandparents filed for guardianship. *Id.*, ¶¶ 3, 5. This court determined that the evidence, which showed consistent attempts by the mother to remain in contact with the child, to provide for his physical well-being, to obtain counseling for him, to focus on his academic performance and address his negative behavior, supported the circuit court's conclusion that a guardianship was not warranted. *Id.*, ¶ 21. Likewise, in *Cynthia H.*, this court upheld the circuit court's determination that guardianship was not warranted when the parents followed the advice of the mother's obstetrician and therapist in placing the child with the child's maternal grandmother while the mother recovered from postpartum depression. *Cynthia H.*, 322 Wis. 2d 615, ¶¶ 4, 6, 30, 50. However, unlike the facts of these cases, this case involved not only allegations of specific instances of parental neglect, but also allegations of an overarching and persistent neglect of parental responsibilities. Further, Ilana was not living apart from Alexis due to a divorce judgment or upon the advice of a physician or counselor, she had not made consistent attempts to stay in contact with Alexis, and she had not attempted to address Alexis's negative behaviors.

¶ 36. In *Barstad*, the court denied a petition for third-party custody despite the fact that the child had

lived in his grandmother's care for two and one-half years without his mother being present. *See Barstad,* 118 Wis. 2d at 569 & n.10. However, the supreme court noted that the mother had maintained a continuous relationship with the child throughout the child's life, living as part of a single "family unit" for most of the eight years between the child's birth and the custody hearing. *Id.* Further, the court noted the mother's testimony that after leaving her mother's home, she had visited her child on a weekly basis. *Id.* at 553. The court determined that the periods of separation between the mother and child did not reflect a neglect of parental responsibility or lack of interest in the child's welfare, but rather the effort of a very young mother to establish her own home. *Id.* at 569. The same cannot be said here. Not only did Ilana leave Alexis in her grandmother's and mother's exclusive care for all but eight months of Alexis's life, Ilana failed to contact, or make herself available for contact from, Alexis or her caregivers on a regular basis. Moreover, the circuit court in *Barstad* found the mother to be both fit and able to have the care and custody of the child. Again, the same cannot be said here.

¶ 37. Finally, we note that in each of the post-*Barstad* cases cited by Ilana, the reviewing court upheld the custody determination made by the circuit court based on its findings of fact. *See Robin K.,* 291 Wis. 2d 333, ¶¶ 1, 8–9, 19–20; *Nicholas C.L.,* 293 Wis. 2d 819, ¶¶ 18–22; *Cynthia H.,* 322 Wis. 2d 615, ¶¶ 1, 30; *but see, Barstad,* 118 Wis. 2d at 554–55 (reversing the circuit court's decision as relying on an incorrect standard of law). This stands to reason. A circuit court's custody determinations are discretionary and are given great weight on appeal because the determinations are based on the circuit court's first-hand observation and

experience with the persons involved. *Cynthia H.*, 322 Wis. 2d 615, ¶ 33 (citing *Barstad*, 118 Wis. 2d at 554). Thus we cannot underestimate the value of the circuit court's ability to observe Ilana, Ilya, Stephen and Ellis during the course of the hearing.

¶ 38. A custody award will be upset only if the appellate court is convinced that the custody determination is based on clearly erroneous findings of fact, Wis. Stat. § 805.17(2), or an erroneous exercise of discretion. *Barstad*, 118 Wis. 2d at 554. Here, we conclude that the circuit court properly exercised its discretion in awarding guardianship of Alexis to Stephen and Ilya. We are satisfied that the court's findings in support of its "extraordinary circumstances" determination likewise support a determination that "compelling reasons" exist for such a guardianship award.

### *Visitation*

¶ 39. Immediately following the circuit court's award of guardianship to Stephen and Ilya, Ilana asked the court to address a visitation schedule. The circuit court declined to do so, stating: "That's up to the guardian . . . . The Court does not get involved in the issue of what a guardian does unless they do something that is unfit." Ilana asserts that "the court apparently believed it did not have the authority to address [Ilana's] request for a placement order." She contends that, while there is not a specific guardianship statute addressing a parent's right to placement or visitation in a third-party guardianship, the court had authority to address visitation under its plenary power and equitable jurisdiction. Indeed, the supreme court observed in *Holtzman v. Knott*, 193 Wis. 2d 649, 685, 533 N.W.2d

419 (1995), that it had "recently reaffirmed the courts' use of their equitable power to order visitation in the best interest of a child in circumstances not described in any visitation statute." However, Ilana's argument misses the point.

¶ 40. The record reflects that the circuit court did not decline to address Ilana's visitation request based on a lack of authority or jurisdiction. Rather, the court exercised its discretion in deferring to the guardians. We see no error in the court's decision. While previously caring for Alexis, Ilya and Stephen consistently facilitated visits with Ilana. At the time of Ilana's request, there had been no indication that the parties would not be able to arrive at a visitation schedule. The circuit court advised Ilana that the court would get involved if needed.[11] In sum, Ilana's complaint regarding visitation was premature.

## CONCLUSION

¶ 41. We conclude that the circuit court correctly determined that Wisconsin had initial child custody jurisdiction under WIS. STAT. § 822.21 and the UCCJEA. We further conclude that the circuit court properly exercised its discretion in granting guardianship of Alexis to Ilya and Stephen and in deferring to them on the issue of visitation. We therefore affirm the order.

*By the Court.*—Order affirmed.

[11] We note that WIS. STAT. § 54.68 provides for the continuing jurisdiction of the court, including review of a guardian's conduct for failing to act in the best interests of the ward. Sec. 54.68(1) & (2)(g).