COURT OF APPEALS
DECISION
DATED AND FILED

August 2, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If
published, the official version will appear in
the bound volume of the Official Reports.

A party may file with the Supreme Court a
petition to review an adverse decision by the
Court of Appeals. *See* WIS. STAT. § 808.10
and RULE 809.62.

Appeal No.    **2021AP1409**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019GN46

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE GUARDIANSHIP OF J. F. A.-F.:

AMANDA FISHER,

   PETITIONER-APPELLANT,

 V.

M. F. AND J. F.,

   RESPONDENTS-RESPONDENTS.

APPEAL from an order of the circuit court for Marathon County:
GREGORY J. STRASSER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent
or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Amanda Fisher appeals an order terminating her guardianship over Jane, who is the biological daughter of Molly and Jacob.[1] Fisher contends that the circuit court erred by terminating the guardianship because Molly and Jacob failed to prove: (1) that a substantial change in circumstances had occurred since the last order affecting the guardianship was entered; (2) that Molly and Jacob were fit, willing, and able to carry out the duties of a guardian, or that no compelling facts or circumstances demonstrated that a guardianship was necessary; and (3) that termination of the guardianship would be in Jane's best interests.  We reject Fisher's arguments and affirm.

## BACKGROUND

¶2    Fisher and Molly have been friends since they were in the sixth grade.  When Molly was sixteen years old, she became pregnant, dropped out of school, and began using drugs.  Molly voluntarily awarded guardianship of her firstborn child to the child's grandparents.

¶3    Molly continued using drugs until she became pregnant with her second child, Dawson, who is also Jacob's son.  At some point after Dawson's birth, Molly relapsed.  In 2012, Dawson was removed from Molly and Jacob's

---

[1] For ease of reading, we use pseudonyms when referring to the child at issue in this confidential matter, and when referring to her biological parents and sibling.

There is some indication in the record that Jacob may not be Jane's biological father. Pursuant to WIS. STAT. § 891.41(1)(a) (2019-20), however, Jacob is presumed to be Jane's natural father because Jane was born during his marriage to Molly.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

care, and they were both charged with child neglect. Jacob's parents were subsequently granted permanent guardianship of Dawson.

¶4    In approximately 2013, Molly and Jacob were married. During the ensuing years, Molly continued using drugs and accumulated additional criminal charges. The record reflects that Jacob also has a lengthy criminal history, including convictions for possession of a controlled substance in 2012, possession of drug paraphernalia in 2014, disorderly conduct in 2015, possession of THC and drug paraphernalia in 2016, and disorderly conduct in 2017.

¶5    According to Fisher, when Molly was released from jail in June 2018,[2] she told Fisher that she was pregnant and that Fisher should "get ready" because Molly "was going to make [Fisher] a mom." Molly stated she "didn't want or couldn't take care of the baby, that it was not [Jacob's] child, it was someone else who was in a lot of trouble." Molly moved in with Fisher until the baby, Jane, was born in August 2018. Fisher was present for Jane's birth, cut her umbilical cord, and named her. Jane's umbilical cord tested positive for methamphetamine, alprazolam (the generic name for Xanax), and amphetamine.

¶6    Fisher took Jane home from the hospital and provided care for her. When Jane was a few days old, Molly attempted to care for Jane on her own, but she frequently needed Fisher's help. Molly and Jane lived with Fisher from September or October 2018 until November 2018. From November 2018 until May 2019, Jane lived with Fisher but also spent periods of time with Molly. At some point in time, Molly granted Fisher power of attorney for Jane.

---

[2] The record does not indicate why Molly was in jail prior to her release in June 2018.

3

¶7    In May 2019, Jane was removed from Molly's care after Molly and Jane were found in a hotel room with used needles and drugs. Molly was taken into police custody following that incident. According to Fisher, while Molly was in jail, Molly asked Fisher to "go get guardianship papers because she wanted to prove to me that this was my daughter and she wanted [Jane] to be with me." Fisher then petitioned for permanent guardianship of Jane, and Molly and Jacob both filled out forms consenting to the guardianship. In July 2019, the circuit court entered an order appointing Fisher as the guardian of Jane's person and estate.

¶8    In October 2019, Molly was sentenced to prison on a charge of manufacture or delivery of counterfeit amphetamines, contrary to WIS. STAT. § 961.41(2)(bm). That sentence was stayed, however, so that Molly could participate in the Marathon County Drug Recovery Court (hereinafter "Drug Court"). According to the participant handbook, Drug Court is a four-phase intervention program for adults who have pled guilty to one or more felony crimes related to drugs and who are having difficulty staying clean and sober. Drug Court participants are required to engage in treatment, demonstrate periods of abstinence from drug and alcohol use, submit to regular drug testing, make regular appearances in Drug Court, and maintain housing and employment.

¶9    Molly initially struggled with Drug Court. On January 27, 2020, Molly and Jacob were using drugs and began arguing. The police were called, and Molly told an officer that Jacob had grabbed her face and lifted her head off of a bed for approximately ten seconds, causing her pain. Jacob was arrested, and during a search incident to his arrest, police found on Jacob a plastic bag containing methamphetamine.

¶10    Following the January 2020 incident, Molly's probation officer imposed a probation condition that prohibited her from having contact with Jacob. Molly and Jacob participated in marital counseling in order to have the no-contact condition removed. Molly also entered an inpatient treatment program, which she completed on April 2, 2020.

¶11    On May 20, 2020, Molly filed a pro se petition to terminate Fisher's guardianship of Jane. A hearing on the petition took place on September 21, 2020. During the hearing, Molly testified that she completed phase 1 of Drug Court on May 2, 2020, and completed phase 2 on September 2, 2020. Molly further testified that phases 3 and 4 of Drug Court each require a minimum of 120 days to complete. Molly therefore conceded that, from the date of the hearing, over 200 days would elapse, at a minimum, before she finished phase 4 of Drug Court.

¶12    Fisher opposed Molly's petition to terminate the guardianship, testifying that she was concerned about Jane's safety while in Molly's care, given Molly's history of drug dependency. Fisher emphasized that Molly had been addicted to drugs for twenty years and had been sober for only the last six months.

¶13    In an oral ruling, the circuit court denied Molly's petition to terminate the guardianship.[3] The court reasoned that it was "too soon" to terminate the guardianship, given that Molly had not yet graduated from Drug Court. Nevertheless, the court ordered Jane's guardian ad litem (GAL) to

---

[3] The Honorable Gregory J. Strasser denied Molly's May 2020 petition to terminate the guardianship. Judge Strasser also entered the order at issue in this appeal, which granted Molly and Jacob's March 2021 petitions to terminate the guardianship. In addition, the record reflects that Judge Strasser presided over at least some of Molly's Drug Court proceedings.

> put together a placement changeover starting with overnights in October, at least one going forward. Such that as [Molly] continues to meet the requirements of drug court which, basically, means she's sober, no new crimes, continues to go to treatment, does her meetings, advances through her phases; that slowly but surely she gets more overnights until her graduation at which time she can either re-approach the termination of guardianship or it can be voluntarily terminated.

No written order was entered memorializing the court's September 21, 2020 oral ruling.

¶14    Over the next several months, Molly and Jacob were granted increasing periods of physical placement of Jane, and eventually Jane's time was equally split between their home and Fisher's residence. On March 9, 2021, both Molly and Jacob filed pro se petitions to terminate the guardianship. In the sections of their petitions where Molly and Jacob were asked to identify a substantial change in circumstances that had occurred since the last order affecting the guardianship was entered, both Molly and Jacob indicated that the guardianship was intended to be temporary, not permanent. Molly also noted in a different section of her petition that Jane's "[p]arents have gone [through] treatment and drug [c]ourt as well as [p]arenting [c]lasses."

¶15    Jane's GAL moved to dismiss Molly and Jacob's petitions, arguing that Molly and Jacob had failed to allege "specific facts necessary to terminate a guardianship under [WIS. STAT. §] 48.9795(11)(b)[1.]" Fisher, in turn, filed a motion requesting psychological examinations of Molly and Jacob, pursuant to WIS. STAT. § 804.10, in order to determine their fitness to care for Jane, given their history of drug abuse, domestic violence, and mental instability. The circuit court deferred making a decision on Fisher's motion until after it heard Molly and Jacob's testimony at the hearing on their petitions to terminate the guardianship.

6

¶16 The hearing on Molly and Jacob's petitions took place on May 19, 2021. At the outset of the hearing, the circuit court denied the GAL's motion to dismiss, broadly interpreting Molly and Jacob's pro se petitions as meeting the standards set forth in WIS. STAT. § 48.9795(11)(b)1. The court also determined that because it had never entered a written order denying Molly's previous petition to terminate the guardianship, the "last order affecting the guardianship" under § 48.9795(11)(b)1. was the July 2019 order appointing Fisher to serve as guardian. The court therefore concluded that, for purposes of determining whether a substantial change in circumstances had occurred, it could consider the time period from July 2019 until the May 19, 2021 hearing date.

¶17 At the May 19, 2021 hearing, Molly testified that she had graduated from Drug Court and had been sober for approximately fifteen months. She also testified that she had a valid driver's license, two vehicles, stable housing, and did not owe any bills. Molly further testified that she had been involved in parenting classes and had the support of both her parents and Jacob's parents. She also explained that even though she had completed Drug Court and was therefore no longer required to see a counselor, she continued doing so for additional support in her recovery. Molly also testified that Jacob's parents would soon be voluntarily terminating their guardianship of her and Jacob's son Dawson.

¶18 Molly further explained that when she initially consented to Fisher's guardianship of Jane, she was told by Fisher's attorney that the guardianship would be temporary and that she "could change it at any time." Molly testified that she wanted Fisher to remain in Jane's life even if the guardianship were terminated. She testified that she had previously proposed allowing Fisher to have visitation with Jane for one weekend each month, but that proposal was not "set in stone."

¶19   Nonetheless, Molly acknowledged that she had witnessed Jane having "problems" or "difficulty" during placement exchanges. Evidence was presented that, as a result of those difficulties, Fisher took Jane to see a therapist, who diagnosed her with separation anxiety disorder and adjustment disorder with anxiety. Molly testified that she had participated in an appointment with Jane's therapist, had another appointment scheduled, and had set up a time for the therapist to observe Jane in Molly and Jacob's home.

¶20   Jacob also testified at the May 19, 2021 hearing. He admitted that he had been charged with battery, domestic abuse, and possession of drugs following the January 27, 2020 incident with Molly, but he emphasized that he had not been convicted of those charges. He described the incident as a one-time "relapse," and he testified he had not had any professional drug or alcohol treatment since that time and did not need such treatment. He further testified that he was not receiving—and did not need—any treatment for anger management.

¶21   Jacob confirmed that there had been difficulties during the parties' exchanges of Jane, but he stated that those difficulties had occurred only two times, and he attributed them to Jane being overtired. He described the decision to take Jane to a therapist as "ridiculous" and opined that "no two-year-old on the face of this earth should have counseling yet."

¶22   Fisher testified at the May 19, 2021 hearing that she was concerned that Molly and Jacob were still associating with family members who were "actively engaged with using drugs." Fisher also testified that she was concerned about changes in Jane's behavior since Jane began spending more time at Molly and Jacob's residence. Fisher explained that Jane had become increasingly "clingy" with her, which included crying when Fisher left the room and waking up

in the middle of the night and wanting Fisher to hold her. Fisher further testified that when Molly and Jacob arrive to pick Jane up, Jane will

> wrap[] her arms around my neck telling me I want my mom, I don't want to leave. She will verbally tell them I don't want to go with you. She will start screaming, and crying, and kicking, and yelling. If they try to grab her, she will swat at them … she doesn't want them to grab her.

¶23    A friend of Fisher testified that she had witnessed the placement exchanges between the parties, which had become "increasingly volatile on [Jane's] behalf" over time. She testified that she had seen Jane "[k]icking, screaming, crying, thrashing about, [saying] I don't want to go, I want to stay here, [and] having to be [forcibly] put into a car seat against her will."

¶24    Following the May 19, 2021 hearing, Fisher and the GAL submitted briefs opposing Molly and Jacob's petitions to terminate the guardianship. On July 30, 2021, the circuit court entered a written order granting Molly and Jacob's petitions. The court concluded Molly and Jacob had met their burden to prove that the elements set forth in WIS. STAT. § 48.9795(11)(b)1. were satisfied.

¶25    More specifically, the circuit court determined that a substantial change in circumstances had occurred since the entry of the last order affecting the guardianship because Molly had graduated from Drug Court, and her graduation "incorporate[d], as an event, everything that was involved in [her] effort to graduate." *See* WIS. STAT. § 48.9795(11)(b)1. The court noted that Molly's graduation from Drug Court "means that she demonstrated the ability to remain sober, effectively engage necessary treatment and stabilize her life." The court also stated that the testimony at the May 19, 2021 hearing "showed that both parents have made progress in addressing addiction issues since this guardianship

9

was established and have had additional placement of their daughter. They have avoided incarceration and established a home together."

¶26    The circuit court next concluded that Molly and Jacob were fit parents. *See id.* The court stressed that while both parents had struggled with addiction, they had both made progress in addressing that issue, and Molly, in particular, had participated in and graduated from Drug Court. The court acknowledged that the January 2020 incident in which both parents were using drugs and Jacob allegedly committed domestic abuse against Molly was concerning. The court also expressed concern about Jacob's use of "deflection and excuses, when confronted with the reality of his condition and behavior." The court concluded, however, that those factors alone did not make the parents' household "unsafe."

¶27    In that regard, the circuit court noted there was no evidence that there had been a "repeat" of the January 2020 incident since that time. The court also observed that there was no evidence that Jacob had ever physically injured a child, and there was "no proof of drug use [by Molly or Jacob], over the last year and a half." To the contrary, the evidence showed that Molly was "ready, willing and able to recognize the dangers of the drug culture and domestic violence, and to protect her daughter from the same." The court also stated that Molly's testimony demonstrated "the ability to rationally assess her situation, admit her failures, and meet promises to herself and her daughter for a better future." Additionally, the court explained that addiction "involves relapses," and while evidence regarding the January 2020 relapse was relevant, it was "not conclusive, especially where only one [relapse] is shown over a period of time." The court reasoned that "one event over a lengthy period of time does not establish a pattern, especially where

the mother has treated her addiction, aggressively, and there is no showing that a recalcitrant father has remained in active addiction."

¶28    The circuit court also rejected the GAL's suggestion that Molly and Jacob were not fit parents because Jane did not have her own room at their residence but instead slept in a toddler bed in their bedroom.  The court explained that any criticism "related to the accommodations for [Jane] at the parents['] home[] does not cut to fitness.  It may show poverty.  It may show limited means.  But that does not equate with fitness."

¶29    In the context of its discussion of parental fitness, the circuit court denied Fisher's request for psychological evaluations of Molly and Jacob.  The court reasoned that the parents' mental health had not been challenged "beyond the showing of addiction and one domestic incident a year and a half ago.  That is not a basis for the court to order such assessments, especially where the mother has completed treatment in drug court and has allowed the parties access to her treatment provider."

¶30    The circuit court next concluded there were no compelling circumstances demonstrating that a guardianship was necessary.  See WIS. STAT. § 48.9795(11)(b)1.  The court emphasized the importance of a child being raised by his or her biological parents and the trauma that children experience after that biological connection is severed, particularly when they become old enough to understand what has occurred.  The court acknowledged that Fisher had provided support, stability, and consistency for Jane throughout her life, making sure that her physical and emotional needs were met.  Nevertheless, the court stated there was "no evidence presented to show that the parents cannot meet those needs."  To the extent Molly and Jacob had not done so previously, the court explained that

their failure was due to the fact that "they have not had placement and opportunity to do so. There was no showing of any intentional neglect or abandonment."

¶31 The circuit court then reiterated that Molly and Jacob "are able to act as parents and provide the care necessary for their daughter." The court explained, "This is not a contest as to who can provide the best house, food, doctors or clothes. It is a question of whether the bonds of a parent and child mean less than those things." The court opined that it is

> essential to the care and welfare of a child that they be with their parents if [the parents] are available to provide a safe and proper place to live. This is especially true where it has not been shown that the parents are incapable of providing a supportive and stable household.

The court reiterated that its decision was "not a referendum of the quality of care and love provided by the guardian, as opposed to the parents. It, instead, must focus on the question of whether the mother and father are able to fulfill their role as parents, such that the guardianship is no longer necessary." The court concluded that the evidence showed that Jacob and Molly had met that standard for over one year.

¶32 The circuit court also rejected the notion that the difficulties Jane experienced during her placement exchanges constituted compelling circumstances demonstrating the necessity of a guardianship. The court explained:

> The court agrees that the testimony showed that [Jane] suffers from significant attachment and anxiety disorders. She likely will, while her dual household status continues. But it is not fair to the analysis to conclude that the guardianship should stay in place because, otherwise, "That only makes sense when she is told by the parents that the only home she has ever known is being ripped from her." This misses the point on the question of whether a

12

guardianship is necessary. Ending a guardianship may very well lead to situations where a child's life changes, in sometime emotionally painful ways. But, does that mean that the guardianship is "necessary?" The court cannot agree with such a conclusion or that avoiding the truth now, in favor of an inevitable consequence later, is preferable.

¶33 Turning to Jane's best interests, *see* WIS. STAT. § 48.9795(11)(b)1., the circuit court "incorporated" its preceding analysis, which "[led] the court to conclude that, while [Jane] may have a more comfortable and even easier life with her guardian, the loss of the important life experience of being raised by her biological parents is not in her best interest." The court acknowledged that Molly and Jacob had made "bad choices based upon their addictions and those choices rendered them incapable of providing a safe and stable place for their daughter to live." The court concluded, however, that Molly had "likely moved beyond the grief and trauma she has sustained, and has the means to recognize how the behavior of her and her husband will impact [Jane]." The court explained that while others may demand "more" from a mother, "at what point is there 'enough' when a mother is sober, has a safe home and wants to raise her daughter in her home with the father, as a family unit? At what point is such a relationship not in the best interest of the daughter?" The court emphasized that "[b]eing [Jane's] mother will encourage [Molly's] continued sobriety and responsibility," and "[i]t is certainly in [Jane's] best interest that this occur."

¶34 Having concluded that Molly and Jacob had established each of the criteria set forth in WIS. STAT. § 48.9795(11)(b)1., the circuit court granted their petitions to terminate the guardianship. The court ordered that the guardianship would be terminated "as of September 1, 2021, to allow the parties … to consider the best way to transition away from the guardianship." Fisher now appeals.

**DISCUSSION**

¶35    In February 2020, the Wisconsin Legislature enacted WIS. STAT. § 48.9795(11), which pertains to the termination of minor guardianships.[4]  *See* 2019 Wis. Act 109, § 21.  As relevant here, the statute provides that the parent of a child who is subject to a guardianship may file a petition requesting that the guardianship be terminated.  Sec. 48.9795(11)(b)1.  The petition must allege facts sufficient to show that:  (1) "there has been a substantial change in circumstances since the last order affecting the guardianship was entered"; (2) "the parent is fit, willing, and able to carry out the duties of a guardian or that no compelling facts or circumstances exist demonstrating that a guardianship is necessary"; and (3) "termination of the guardianship would be in the best interests of the child." *Id.*  "The court shall hold a hearing on the petition unless written waivers of objections to termination of the guardianship are signed by all interested persons and the court approves the waivers."  Sec. 48.9795(11)(b)2.  If a hearing is held, "[t]he court shall terminate the guardianship if the court finds that the petitioner has proven the allegations in the petition under subd. 1. by a preponderance of the evidence."  Sec. 48.9795(11)(b)3.

¶36    To date, no case has addressed the standard of review that an appellate court should apply to a circuit court's decision to terminate a minor guardianship under WIS. STAT. § 48.9795(11)(b).  Fisher asserts that we should review the circuit court's decision as to whether a substantial change in

---

[4] Although the guardianship at issue in this appeal predates the enactment of WIS. STAT. § 48.9795(11), that subsection clearly applies to Molly and Jacob's March 2021 petitions to terminate the guardianship.  *See* 2019 Wis. Act 109, § 49(1) ("All guardianships of the person of a minor … in effect on the effective date of this subsection remain in effect and shall be considered guardianships under s. 48.9795 until terminated under s. 48.9795(11).").

14

circumstances occurred for an erroneous exercise of discretion.[5]  Fisher does not address what standard of review applies to the court's ultimate decision to terminate a minor guardianship under § 48.9795(11)(b).  Molly and Jacob have not filed a brief in this appeal and, as such, have not addressed the standard of review.

¶37     For purposes of this appeal, consistent with the assertion in Fisher's brief and with our prior decision in *Cashin v. Cashin*, 2004 WI App 92, ¶¶42-44, 273 Wis. 2d 754, 781, 681 N.W.2d 255, we assume without deciding that the issue

---

[5] In the context of motions to modify maintenance, child support, and physical placement in family law cases, many prior court of appeals decisions have treated the issue of whether a substantial change in circumstances has occurred as a mixed question of fact and law.  *See, e.g.*, *Rosplock v. Rosplock*, 217 Wis. 2d 22, 32-33, 577 N.W.2d 32 (Ct. App. 1998) (maintenance); *Benn v. Benn*, 230 Wis. 2d 301, 307, 602 N.W.2d 65 (Ct. App. 1999) (child support); *Lofthus v. Lofthus*, 2004 WI App 65, ¶17, 270 Wis. 2d 515, 678 N.W.2d 393 (physical placement).  In those cases, the circuit court's factual findings "regarding the 'before' and 'after' circumstances and whether a change ha[d] occurred" were upheld unless clearly erroneous, but we independently reviewed whether the change was "substantial."  *See Rosplock*, 217 Wis. 2d at 33.

Conversely, in *Cashin v. Cashin*, 2004 WI App 92, ¶¶42-44, 273 Wis. 2d 754, 681 N.W.2d 255, we reviewed a circuit court's decision regarding the existence of a substantial change in circumstances for an erroneous exercise of discretion.  In doing so, we relied on the Wisconsin Supreme Court's decision in *Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶17, 269 Wis. 2d 598, 676 N.W.2d 452, which recited the standard of review as follows:

> We now consider whether there was sufficient evidence from which the circuit court could reasonably find a substantial change in the parties' circumstances that would justify the termination of maintenance after two more years.  Circuit courts exercise their discretion when determining the amount and duration of maintenance.  We will not disturb the circuit court's decision regarding maintenance unless the award represents an erroneous exercise of discretion.

(Citations omitted.)  We noted in *Cashin* that "[w]hen a decision of this court and the supreme court are inconsistent, we are bound by the decision of the supreme court."  *Cashin*, 273 Wis. 2d 754, ¶44 (citing *Ambrose v. Continental Ins. Co.*, 208 Wis. 2d 346, 354, 560 N.W.2d 309 (Ct. App. 1997)).  We therefore concluded that "we should follow the supreme court's decision in *Rohde-Giovanni* and review a [circuit] court's decision to deny an extension of maintenance as a discretionary decision, including the decision whether there is a substantial change in circumstances."  *Cashin*, 273 Wis. 2d 754, ¶44.

of whether a substantial change in circumstances has occurred is reviewed for an erroneous exercise of discretion.

¶38 We also note that before WIS. STAT. § 48.9795(11) was enacted, whether a third party should be granted guardianship of a minor was reviewed for an erroneous exercise of discretion. *See, e.g.*, ***Cynthia H. v. Joshua O.***, 2009 WI App 176, ¶33, 322 Wis. 2d 615, 777 N.W.2d 664. Consistent with that prior case law, and absent any argument to the contrary by Fisher, we will uphold the circuit court's decision to terminate the guardianship in this case unless the court erroneously exercised its discretion.

¶39 A circuit court erroneously exercises its discretion when it fails to consider relevant factors, bases its decision on factual errors, or makes an error of law. ***Rohde-Giovanni v. Baumgart***, 2004 WI 27, ¶18, 269 Wis. 2d 598, 676 N.W.2d 452. A discretionary determination "must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." ***Id.*** (citation omitted). Our review of a circuit court's discretionary decisions may involve underlying questions of law and fact. *See* ***Covelli v. Covelli***, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260. We review any questions of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous. *See* ***id.***

¶40 In this case, Fisher argues the circuit court erred by determining that Molly and Jacob had proved each of the criteria necessary for the court to terminate the guardianship under WIS. STAT. § 48.9795(11)(b)1. For the reasons explained below, we conclude the court did not erroneously exercise its discretion by terminating the guardianship.

## I. Substantial change in circumstances

¶41     Fisher argues that the circuit court made an error of law when analyzing whether a substantial change in circumstances had occurred because it failed to consider the proper time period over which a substantial change in circumstances was alleged to have taken place.  As noted above, WIS. STAT. § 48.9795(11)(b)1. directs the court to consider whether a substantial change in circumstances has occurred "since the last order affecting the guardianship was entered."  Fisher asserts that the last order affecting the guardianship was the circuit court's September 21, 2020 oral ruling denying Molly's May 2020 petition to terminate the guardianship.  The circuit court rejected that argument, reasoning that because it had never entered a written order denying the May 2020 petition, the last order affecting the guardianship was the July 2019 order appointing Fisher to serve as guardian.

¶42     Fisher also argues that the circuit court erred by considering Molly's graduation from Drug Court when analyzing whether a substantial change in circumstances had occurred.  Fisher asserts that Molly's graduation did not occur until after Molly and Jacob filed their petitions to terminate the guardianship in March 2021.  WISCONSIN STAT. § 48.9795(11)(b)1. permits a parent to file a petition to terminate a guardianship, and the petition "shall allege facts sufficient to show that there has been a substantial change in circumstances."  Following a hearing, the court shall terminate the guardianship if it finds "that the petitioner has proven *the allegations in the petition* under subd. 1. by a preponderance of the evidence."  Sec. 48.9795(11)(b)3. (emphasis added).  Fisher contends that, when analyzing whether a petition to terminate a minor guardianship should be granted, this language requires a court to consider only the facts that existed at the time the petition was filed.

17

¶43   We assume, without deciding, that the circuit court erred by determining that the last order affecting the guardianship was entered in July 2019—i.e., when the original guardianship order was entered.[6]   We also assume, without deciding, that the court erred by considering the fact that Molly had graduated from Drug Court, given that her graduation did not occur until after

---

[6] In support of her claim that the last order affecting the guardianship was the circuit court's September 2020 oral ruling denying Molly's prior termination petition, Fisher cites WIS. STAT. § 806.06(1), for the proposition that "an oral decision issued from the bench has the same practical effect as when that ruling is reduced to writing and filed with the clerk of the circuit court."   Section 806.06, however, pertains to the granting, rendition, entry, and perfection of *judgments*.  This appeal involves an order, not a judgment.

Moreover, WIS. STAT. § 48.9795(11)(b)1. expressly requires a petition for termination of a minor guardianship to allege that a substantial change in circumstances has occurred "since the last order affecting the guardianship was *entered*."   (Emphasis added.)   Under WIS. STAT. § 806.06(1), a judgment is "granted" when it is "given orally in open court on the record," is "rendered" when it is "signed by the judge or by the clerk at the judge's written direction," and is "entered" when it is "filed in the office of the clerk of court."  *See* § 806.06(1)(a), (b), (d).  Here, the circuit court orally denied Molly's prior termination petition in September 2020, but no written order memorializing the court's ruling was ever filed in the office of the clerk of court.  Thus, to the extent § 806.06(1) applies to the orders at issue in this case, it actually undercuts Fisher's argument that the circuit court "entered" an order affecting the guardianship in September 2020.

Fisher also cites ***Barbian v. Lindner Bros. Trucking Co.***, 106 Wis. 2d 291, 298-99, 316 N.W.2d 371 (1982), for the proposition that "[w]hether an oral ruling is reduced to writing has no effect on its impact or the expectation that the parties will abide by the court's decision; the judicial act is complete."  ***Barbian*** is not wholly on point, however.  In ***Barbian***, the circuit court in a prior action had "rendered an oral decision" granting judgment in favor of Lindner Bros. Trucking and dismissing the Barbians' complaint, and the court had also signed a written order stating that "the defendants have judgment dismissing the Barbians' complaint on its merits." ***Id.*** at 297-98.  The court failed, however, to enter a written judgment in favor of Lindner Bros. Trucking.  ***Id.*** at 298.  Our supreme court concluded that under these circumstances, the circuit court's failure to enter a written judgment did not bar Lindner Bros. Trucking from asserting claim preclusion as a defense in a subsequent lawsuit filed by the Barbians.  ***Id.*** at 298-99.

Unlike ***Barbian***, this case does not involve the application of claim preclusion.  Rather, the issue here is whether the circuit court "entered" an order affecting the guardianship in September 2020, for purposes of WIS. STAT. § 48.9795(11)(b)1.  In addition, in ***Barbian***, the circuit court had signed a written order for judgment in favor of Lindner Bros. Trucking.  No such written order memorializing the circuit court's September 2020 oral ruling exists in this case.

the termination petitions were filed.[7]   Nevertheless, we conclude the court's determination that a substantial change in circumstances had occurred was not an erroneous exercise of discretion.  *See* **Mercado v. GE Money Bank**, 2009 WI App 73, ¶2, 318 Wis. 2d 216, 768 N.W.2d 53 (court of appeals may affirm a circuit court's decision on other grounds); **Lofthus v. Lofthus**, 2004 WI App 65, ¶21, 270 Wis. 2d 515, 678 N.W.2d 393 (court of appeals will search the record for reasons to sustain the circuit court's exercise of discretion).

¶44    Even if limited to the time period between the denial of Molly's previous petition for termination in September 2020 and the filing of the March 2021 petitions, the circuit court's factual findings support a determination that a substantial change in circumstances occurred.  The court found that Molly had graduated from Drug Court, which, as Fisher notes, did not occur until after the March 2021 petitions were filed.  The court expressly stated, however, that Molly's Drug Court graduation "incorporates, as an event, everything that was involved in [her] effort to graduate, and thus those facts must be considered here, on the second petition, no matter when filed."  We read this statement to mean that, when considering whether a substantial change in circumstances had occurred, the court considered not only the fact that Molly had graduated from Drug Court, but the underlying progress that she made in combatting her addiction during the relevant time period.  The court could reasonably conclude that Molly's progress in Drug Court between September 2020 and March 2021—and

---

[7] Citing WIS JI—CHILDREN 180, Fisher argues that interpreting WIS. STAT. § 48.9795(11)(b)1. as prohibiting the consideration of post-petition facts is "consistent with the other sections of [WIS. STAT. ch. 48], which require findings to be made as of the time that the petition is filed."  The cited jury instruction expressly acknowledges, however, that when making certain determinations under ch. 48, a fact finder is permitted to consider post-petition evidence. *See* WIS JI—CHILDREN 180.

particularly her continued sobriety during that time period—constituted a substantial change in circumstances.

¶45 In addition, it is undisputed that following the circuit court's September 2020 denial of Molly's prior petition to terminate the guardianship, Molly and Jacob were granted additional placement time with Jane, which ultimately resulted in Jane spending about half of her time at their residence. The court referenced this additional placement time in its decision granting Molly and Jacob's March 2021 petitions to terminate the guardianship. The court could reasonably conclude that Molly and Jacob's additional placement time with Jane, combined with the absence of any evidence that such additional placement had put Jane in danger or exposed her to drugs or inappropriate behavior, constituted a substantial change in circumstances.

¶46 Fisher argues that no evidence was presented at the May 19, 2021 hearing that Molly "would be able to stay clean without regular supervision and the threat of imprisonment that comes with failure to graduate from Drug Court." Be that as it may, the circuit court could nevertheless reasonably conclude that Molly's progress in Drug Court during the relevant time period—including her documented ability to remain sober—constituted a substantial change in circumstances since the court's denial of Molly's prior petition to terminate the guardianship in September 2020.

¶47 Fisher also argues that although Molly and Jacob had increased their placement time with Jane, the evidence showed that the transitions between the parties' homes were difficult, and Jane's therapist diagnosed her with separation anxiety disorder and adjustment disorder with anxiety. The mere fact that Jane was having difficulty adjusting to her increased placement with Molly and Jacob

does not, however, show that the increased placement time was not a substantial change in circumstances. Although evidence regarding such difficulty might be relevant to the other criteria set forth in WIS. STAT. § 48.9795(1)(b)1., it does not negate a conclusion that a substantial change in circumstances had occurred.

¶48 Fisher further argues: "Not only was there no evidence that anything had changed for [Jacob] between September 2020 and March 2021, there was evidence that circumstances had actually worsened for [Jacob] between July 2019 and May 2021." In support of this assertion, Fisher cites the January 2020 incident, as a result of which Jacob was charged with battery, domestic abuse, and possession of drugs. Fisher also asserts that both Molly and Jacob were "in denial about [Jacob's] need for treatment to address the issues that led to the January 2020 incident." Fisher additionally contends that during the May 19, 2021 hearing, Jacob exhibited "a lack of awareness and understanding about mental health issues facing" Molly and Jane.

¶49 Fisher's argument regarding the January 2020 incident is misplaced. According to Fisher, the proper time period for determining whether a substantial change in circumstances occurred in this case was from September 2020 until March 2021. Consequently, the January 2020 incident is not relevant to show that circumstances "had actually worsened for [Jacob]" during the operative time period. Moreover, the circuit court expressly explained that although the January 2020 incident was concerning, there was no evidence that any similar incident had occurred since that time. The court specifically found that "one event over a lengthy period of time does not establish a pattern, especially where the mother has treated her addiction, aggressively, and there is no showing that a recalcitrant father has remained in active addiction." Under these circumstances, the existence of the January 2020 incident does not show that the court

21

erroneously exercised its discretion by determining that a substantial change in circumstances had occurred.

¶50 In addition, the circuit court acknowledged that Jacob had continued to use "deflection and excuses, when confronted with the reality of his condition and behavior" and that he "diverted blame from himself through his testimony." Those findings, however, did not prevent the court from concluding—based on Molly's progress in Drug Court and Jane's increased placement with Molly and Jacob—that a substantial change in circumstances had occurred. Although some of Jacob's behaviors and attitudes may have remained unchanged, other evidence supported the court's determination regarding the existence of a substantial change in circumstances. As such, the court's determination in that regard was not an erroneous exercise of discretion.

## II. Parental fitness

¶51 Fisher next argues that the circuit court erred by finding that Molly and Jacob were fit, able, and willing to carry out the duties of a guardian. *See* WIS. STAT. § 48.9795(11)(b)1. We disagree. The court observed that the guardianship was initially put in place due to both parents' struggles with addiction and the consequences arising from their addictions. As summarized above, the court found that both Molly and Jacob had made progress in addressing their addiction issues and that Molly, in particular, had demonstrated the ability to "remain sober, effectively engage necessary treatment and stabilize her life." The court also emphasized that Molly and Jacob had been granted increased placement of Jane, and there was no evidence of any drug use or harm to Jane during that time. Based on the evidence presented at the May 19, 2021 hearing, the court's

determination that Molly and Jacob were fit, able, and willing to carry out the duties of a guardian was not an erroneous exercise of discretion.

¶52    Fisher asserts the circuit court's determination that Molly and Jacob were not "unsafe" is not the same as finding that they were fit, able, and willing to carry out the duties of a guardian. Fisher observes that a person appointed as guardian of a minor has "the duty and authority to make important decisions in matters having a permanent effect on the life and development of the child and the duty to be concerned about the child's general welfare," including but not limited to the rights and responsibilities of legal custody. *See* WIS. STAT. § 48.023. "Legal custody," in turn, "confers the right and duty to protect, train and discipline the child, and to provide food, shelter, legal services, education and ordinary medical and dental care." WIS. STAT. § 48.02(12).

¶53    Fisher asserts there was "no evidence" presented at the May 19, 2021 hearing that Molly and Jacob were able to assume many of the duties that Fisher performed as Jane's guardian. For instance, Fisher contends that Molly and Jacob failed to demonstrate that they would be able to provide for Jane's full-time needs, "especially once she grows too big to sleep in a crib in their bedroom anymore, or if they also assume the demands of full-time care of her older brother." In further support of this point, Fisher asserts that Molly and Jacob admitted they provided "no financial assistance to help Fisher during the guardianship."

¶54    The evidence established, however, that Jane's placement with Molly and Jacob had increased to approximately fifty percent of the time. There was no evidence that Molly and Jacob were unable to provide for Jane's needs during the time periods when she was in their care. To the contrary, Molly

23

testified that she had stable housing, two vehicles, and did not owe any bills. Molly further testified that she was a stay-at-home mom and was involved in homeschooling Dawson, while Jacob was employed as a caretaker for his aunt. This testimony supported a determination that Molly and Jacob were able to provide for Jane's needs. Moreover, we agree with the circuit court that any criticism "related to the accommodations for [Jane] at the parents['] home[] does not cut to fitness. It may show poverty. It may show limited means. But that does not equate with fitness." The fact that Fisher may, in some respects, be better equipped financially and otherwise to provide for Jane's needs does not demonstrate that Molly and Jacob are unable to do so.

¶55    Fisher also asserts that Molly and Jacob "did not show a willingness or ability to meet all of [Jane's] medical and dental needs." She notes that, at the time of the May 19, 2021 hearing, neither Molly nor Jacob knew the names of Jane's medical or dental providers, and they had not taken her to any medical or dental appointments. She further contends Jacob's testimony showed a strong likelihood that, if the guardianship ended, Jane would not continue receiving mental health treatment for her separation anxiety disorder and adjustment disorder.

¶56    These arguments do not show that the circuit court erroneously exercised its discretion. Notably, both Molly and Jacob testified that they had not taken Jane to medical and dental appointments because, as a result of the guardianship, they did not have the right to do so. Molly testified, however, that Fisher "tells [her] everything" about Jane's medical and dental appointments. Jacob similarly testified that he had not requested any information about Jane from a doctor or dentist because Fisher "sends everything to [Molly], so I don't need to." Additionally, while Jacob expressed skepticism about whether Jane needed to

be treated by a therapist, Molly testified that she had initiated a meeting with Jane's therapist, had set another appointment with the therapist, and had arranged for the therapist to visit her home. Based on this evidence, the court could reasonably conclude that Molly and Jacob were willing and able to provide for Jane's medical and dental care.

¶57 Fisher next suggests that Molly and Jacob were unfit to carry out the duties of a guardian based on their history of drug use and their continued association with family members who used drugs. The circuit court found, however, that both Molly and Jacob had demonstrated progress in combatting their addictions. In particular, the court found that Molly had "aggressively" treated her addiction and that there was no evidence that Jacob had "remained in active addiction." These findings support the court's determination that Molly and Jacob were fit, willing, and able to carry out the duties of a guardian, despite their past issues with drug addiction.

¶58 Finally, Fisher asserts the evidence showed that both Molly and Jacob had untreated mental health issues. Fisher does not, however, cite any evidence that Jacob has been diagnosed with any mental health disorder. Molly testified that she has been diagnosed with depression and anxiety and that she takes medication to treat those conditions. Molly also testified that although she had been diagnosed with bipolar disorder in the past, she believed it was "drug-induced bipolar," and she had not taken any medication for that condition "for awhile." Based on Molly's testimony, the circuit court could reasonably conclude that Molly's prior diagnosis of bipolar disorder was caused by her drug use and was no longer an issue because she had stopped using drugs. Consequently, Fisher's assertion regarding untreated mental health issues does not convince us that the court erroneously exercised its discretion when it determined

25

that Molly and Jacob were fit, able, and willing to carry out the duties of a guardian.

### III. Compelling facts or circumstances

¶59    Fisher next argues that the circuit court erred by concluding there were no compelling facts or circumstances demonstrating that a guardianship was necessary. *See* WIS. STAT. § 48.9795(11)(b)1.  Again, we disagree that the court erroneously exercised its discretion in this regard.[8]

¶60    In addressing this issue, the circuit court focused on the value to Jane of being raised by her biological parents and the trauma that she would likely experience absent that relationship, particularly as she grew older.  The court recognized that, to date, Fisher had been "the person that makes certain [Jane's] health and emotional needs are met."  The court reasoned, however, that there was "no evidence presented to show that the parents cannot meet those needs.  To the extent they have not, the evidence showed that it is because they have not had placement and opportunity to do so.  There was no showing of any intentional neglect or abandonment."  The court expressed its belief that it is "essential to the care and welfare of a child that they be with their parents if [the parents] are available to provide a safe and proper place to live."  The court then reasoned that the focus of the compelling circumstances inquiry is "on the question of whether

---

[8] Having found that Molly and Jacob were fit, willing, and able to carry out the duties of a guardian, the circuit court was not required to make an additional finding that there were no compelling facts or circumstances demonstrating that a guardianship was necessary. *See* WIS. STAT. § 48.9795(11)(b)1. (requiring a petition to terminate a minor guardianship to allege "that the parent is fit, willing, and able to carry out the duties of a guardian *or* that no compelling facts or circumstances exist demonstrating that a guardianship is necessary" (emphasis added)).  For the sake of completeness, however, we choose to address this additional basis for the court's decision.

the mother and father are able to fulfill their role as parents, such that the guardianship is no longer necessary." The court concluded the evidence showed that Molly and Jacob had been fulfilling their obligations as parents "for well over a year."

¶61 Fisher contends there are compelling circumstances necessitating continuation of the guardianship, based on Jane's "significant anxiety in relation to her placement in [Molly and Jacob's] residence and loss of placement time with Fisher." The circuit court acknowledged that Jane had experienced increased difficulty when transitioning between her two households and had been diagnosed with attachment and anxiety disorders. The court reasoned, however, that such difficulties would likely continue as long as Jane continued splitting her time between two households. The court therefore reasonably concluded that Jane's difficulties surrounding the transitions did not provide a compelling reason not to terminate the guardianship.

¶62 Fisher also contends that by focusing on Jane's biological connection to Molly and Jacob, and on the fact that there was no evidence Jane would not be safe in their care, the circuit court applied the incorrect legal standard. Fisher argues that, under the standard set forth in cases decided before the enactment of WIS. STAT. § 48.9795(11), Molly and Jacob's abandonment, persistent neglect of parental responsibilities, and extended disruption of parental custody over Jane constitute compelling reasons to keep the guardianship in place. *See, e.g.*, ***Richard D. v. Rebecca G.***, 228 Wis. 2d 658, 663, 599 N.W.2d 90 (Ct. App. 1999) (quoting ***Barstad v. Frazier***, 118 Wis. 2d 549, 568, 348 N.W.2d 479 (1984)).

27

¶63    Fisher's argument fails because the record does not support a conclusion that—at the time the petitions to terminate the guardianship were filed—Molly and Jacob had abandoned Jane or persistently neglected their parental responsibilities.  To the contrary, the circuit court found that although Molly and Jacob had initially consented to the guardianship as a result of their drug addiction issues, both parents had since made progress in addressing those issues and had been granted additional placement time with Jane.  The court expressly found that there was "no showing of any intentional neglect or abandonment."  Furthermore, the fact that Jane's placement time with Molly and Jacob had increased to approximately fifty percent supported a conclusion that any previous "extended disruption of parental custody" no longer constituted a compelling circumstance showing that the guardianship remained necessary.  Accordingly, even applying the compelling circumstances standard set forth in *Barstad* and *Richard D.*, we conclude Fisher has failed to show that the court erroneously exercised its discretion.

## IV.  Jane's best interests

¶64    Lastly, Fisher argues the circuit court erred by concluding that termination of the guardianship would be in Jane's best interests.  *See* WIS. STAT. § 48.9795(11)(b)1.  She contends the court erred by focusing too much on Jane's biological connection to Molly and Jacob.  She also contends that the court applied the incorrect legal standard by focusing on Molly's best interests, rather than Jane's best interests.  Fisher further contends that the court's decision improperly shifted the burden of proof regarding Jane's best interests to Fisher and the GAL.  In addition, while Fisher concedes that § 48.9795(11)(b)1. does not list any factors that a court should consider when assessing a child's best interests, she contends that the court should have applied the factors set forth in WIS. STAT. § 48.426(3)—

pertaining to termination of parental rights—and WIS. STAT. § 767.41(5)(am)—pertaining to legal custody and physical placement in family law cases. She asserts those factors show that terminating the guardianship was not in Jane's best interests.

¶65 The circuit court did not erroneously exercise its discretion by determining that termination of the guardianship would be in Jane's best interests. The court appropriately considered the effect that the "loss of the important life experience of being raised by her biological parents" would have on Jane. Although Fisher may disagree with the emphasis that the court placed on that factor, she does not cite any legal authority in support of the proposition that Jane's biological connection to Molly and Jacob was an inappropriate factor for the court to consider.

¶66 As for Fisher's assertion that the circuit court "favor[ed] the interests of the parent over [those] of the child," when read in its entirety, the court's decision does not support that assertion. The court's discussion of Molly's best interests occurred in the context of its discussion of Jane's best interests. The court stated: "It is important to remember that it is *in the best interest of [Jane]* that her mother be well and encouraged in her sobriety. Being [Jane's] mother will encourage [Molly's] continued sobriety and responsibility. It is certainly *in [Jane's] best interest* that this occur." (Emphasis added.) As this quotation shows, the court did not elevate Molly's best interests over Jane's. Rather, the court determined that terminating the guardianship would further encourage Molly in her continued sobriety, which, in turn, would be in *Jane's* best interests.

¶67 We also reject Fisher's argument that the circuit court improperly shifted the burden of proof regarding Jane's best interests to Fisher and the GAL.

Fisher asserts that the court "presumed that so long as [Molly] and [Jacob] showed they were fit, then the GAL and Fisher had to show that termination of the guardianship was *not* in [Jane's] best interests in order to prevent termination by the court." We do not read the court's decision as shifting the burden of proof. Rather, the court concluded, based upon the totality of the record, that terminating the guardianship would be in Jane's best interests due to: (1) the importance of Jane's biological connection to Molly and Jacob; (2) both parents' progress in addressing their addiction issues; (3) the parents' ability and willingness to parent their daughter; and (4) the fact that being Jane's mother would encourage Molly to remain sober, which, in turn, would benefit Jane.

¶68 Finally, we reject Fisher's argument that the circuit court erred by failing to apply the factors set forth in WIS. STAT. § 48.426(3) and WIS. STAT. § 767.41(5)(am). First, we observe that neither Fisher nor the GAL argued below that the court should consider those factors. "We will not … blindside [circuit] courts with reversals based on theories which did not originate in their forum." *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995).

¶69 Second, while Fisher asserts that various factors listed in the two cited statutes would have supported a conclusion that it was in Jane's best interests to continue the guardianship, the circuit court was not required to weigh the factors in the manner that Fisher suggests. Moreover, both of the cited statutes permit a court to consider factors other than those that are specifically enumerated in the statutory text. *See* § 48.426(3) (stating the court "shall consider but not be limited to the following"); § 767.41(5)(am)14. (permitting a court to consider "[a]ny other factor that the court determines to be relevant"). Here, the court could have reasonably decided to give more weight to the factors cited in its written decision than to the statutory factors that Fisher now cites. For these

reasons, we reject Fisher's claim that the court's determination regarding Jane's best interests was an erroneous exercise of discretion.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.